(*Circuit Court of Cook County. In Chancery.*)

### Truman A. Taylor

### vs.

### The Pullman Company.

(January 6, 1902.)

1. INJUNCTION—DISMISSAL OF BILL—AMENDMENT. If the court is of opinion that the bill, where the sole relief sought is injunction, does not make out a case entitling the party to an injunction, and that it is incapable of amendment so as to entitle the party to the relief sought, the court will, upon motion of either party, dismiss the bill for want of equity.

2. SUPPLEMENTAL BILL—EFFECT OF. A motion for leave to file a supplemental bill, and for a temporary injunction, is a waiver of

a prior motion for a temporary injunction, and takes the place thereof.

3. PRACTICE—RENEWAL OF MOTION FOR INJUNCTION. Where a motion for an injunction, or to dissolve one, is passed upon by one branch of the court, it is an improper practice to renew such motion based upon the same identical pleadings and evidence, before another branch of the court.

4. SUPPLEMENTAL BILL AFTER DENIAL OF ORIGINAL APPLICATION FOR INJUNCTION. If after the decision of the original motion for an injunction new facts arise concerning the matter in dispute, the party has a right to renew his motion for an injunction and base the same upon the pre-existing facts and pleadings in the cause and upon the new matters which are set forth in the supplemental bill.

5. MOTIVE OF COMPLAINANT IN FILING BILL FOR INJUNCTION. Upon a motion for a temporary injunction by a stockholder of a corporation to enjoin it from purchasing the property of another corporation—the issuance of which is largely a matter of discretion of the chancellor—the court would cease to be a court of equity and conscience if it did not take into consideration the motive of the complainant, or the real party in interest in instituting the suit (see note at end of case).

6. INJUNCTION NOT GRANTED FOR IMPROPER PURPOSES. The writ of injunction is the strong arm of the court, but it is wielded and controlled by the conscience and discretion of the chancellor, and its use for improper or unlawful purposes will not be permitted.

7. QUASI-ESTOPPEL IN EQUITY—LACHES. Where complainant in December, 1899, filed his bill for a temporary injunction to restrain the Pullman Company from purchasing the Wagner Company and the motion was denied, and thereafter the Wagner Company was dissolved, and there were large transactions in the sales of the stock of the company, and the complainant stood by and witnessed the stock of the Pullman Company issued for the purchase of the assets of the Wagner Company, traded in publicly for more than a year without further making any move in his suit, he has slept upon his rights, by failing to prosecute his suit, until there has arisen a *quasi*-estoppel against obtaining relief by injunction, if he was ever entitled to any.

8. LIS PENDENS TO PURCHASERS OF CORPORATE STOCK. Where the complainant has not prosecuted his suit in good faith with all reasonable diligence and without unnecessary delay, purchasers of the stock of the Pullman Company issued while this suit for a temporary injunction was pending cannot be held to have

taken the stock with constructive notice of the pendency of the suit and subject to future proceedings therein.

9. PARTIES—LACK OF NECESSARY PARTIES. The holders of the twenty million dollars of stock of the Pullman Company issued during the pendency of this suit are necessary parties to the supplemental bill proposed to be filed and for a lack of such parties the motion for a temporary injunction must be denied.

10. ULTRA VIRES—PULLMAN COMPANY—POWER TO PURCHASE ASSETS OF WAGNER COMPANY ENGAGED IN SAME BUSINESS. Under its charter the Pullman Company had power to purchase railway cars without limitation as to number or as to the party from whom the purchases may be made, and also all the powers, privileges, rights, etc., incident to such corporations and necessary or useful for the purposes of the corporation. *Held* that the Pullman Company immediately upon its organization could have made a purchase of the assets of the Wagner Company engaged in like business, "as incident to, necessary and useful" to it in the commencement of its business, and having such power at the start of its business it could make such purchase at any time thereafter that it was considered necessary or useful in carrying on the business of the corporation; and whether such purchase would be necessary or useful was for the board of directors to determine; and while such purchase might be an abuse of the charter power it was not an *ultra vires* act.

11. DIRECTORS, LIABILITY OF, FOR MISTAKE AS TO VALUATION. An honest mistake of directors as to values gives neither the state nor any stockholder a ground of action.

12. POWER TO PURCHASE CARS, RIGHTS OF CORPORATION UNDER. The power to purchase cars and lease the same to railroad companies confers power to purchase cars which are already leased to railroad companies.

13. ULTRA VIRES ACTS—STOCKHOLDER OF ONE CORPORATION CANNOT COMPLAIN OF ULTRA VIRES ACTS OF ANOTHER CORPORATION. A stockholder in one corporation has no footing in a court of equity to enforce purely public, or redress purely private rights as to or in connection with alleged *ultra vires* acts of another corporation. That is left to the people of the state under which the corporation had its charter, or to the stockholders or creditors having an interest.

14. ULTRA VIRES ACTS—RIGHT OF STOCKHOLDER TO QUESTION. A stockholder has a standing to question the *ultra vires* acts of his own corporation by which he may be injured because of the trust relation existing between him and the corporation.

15. POWER OF CORPORATIONS AND JOINT STOCK ASSOCIATIONS ENGAGED IN A BUSINESS AFFECTED WITH A PUBLIC INTEREST, TO DISSOLVE.

A corporation chartered to carry on a business affected with a public interest is under an obligation or duty to carry on such business during the life of its charter, and not to discontinue its business and dissolve, except with the consent of the state, but a joint stock association (such as the Wagner Joint Stock Association) organized under a law expressly providing that such associations may be dissolved in pursuance of its articles of association, whose articles provide for a dissolution upon sixty days' notice given, can dissolve itself because there is a limit to the implied obligation to continue in business, granted by the state, to the effect that it should serve the state until it choose to dissolve itself in pursuance of its articles of association; nor under such a provision is there any implied obligation not to dissolve for the purpose of selling its property, or for the purpose of enabling its shareholders to sell their interest in such property, for cash or for the stock of some other corporation.

16. RAILROADS—DUTY TO FURNISH FACILITIES. A railroad company is under an obligation to furnish transportation to the public and to furnish all known appliances. It may construct its own cars and operate the same if it desires, or it may lease cars and contract for service to be rendered in connection with the running thereof, with any person or corporation it sees fit.

17. PURCHASE OF PROPERTY OF COMPETITOR BY PULLMAN COMPANY NOT VIOLATION OF ANTI-TRUST LAWS. While the purchase of the Wagner Company by the Pullman Company may have removed the latter's chief competitor, yet the right to contract in that respect as to service by sleeping and dining cars with railroad companies is open to all. The purchase or combination of the Pullman Company with the stock and property of the Wagner Company did not necessarily give the Pullman Company the power to raise prices or prevent competition in the business of contracting with railway companies for the use of sleeping cars and furnishing accommodations connected therewith, and such purchase is not a violation of the anti-trust acts of Illinois, or of the United States act against restraint of trade and monopolies.

18. MONOPOLIES AND COMBINATIONS, WHEN ILLEGAL. It is not every combination that is prohibited by the anti-trust laws, or that is opposed to public policy. It is not sufficient to create an illegal monopoly, that the transaction challenged may tend to restrain competition or tend to create a monopoly. The transaction complained of must necessarily put the purchaser in the position where he can, if he desires, create a monopoly.

19. PUBLIC POLICY DEFINED. By public policy is intended that principle of law which holds that no subject can lawfully do that

which has a tendency to be injurious to the public, or against the public good, which may be termed a policy of the law or public policy in the administration of the law.

20. COURTS CANNOT DECLARE THAT AGAINST PUBLIC POLICY WHICH THE STATE PERMITS TO BE DONE. The courts cannot permit that to be declared against public policy which the state permits to be done. To permit the courts to declare that to be illegal and void which is authorized by the legislature of the state, would be to substitute the courts for the legislature.

21. PUBLIC POLICY OF ILLINOIS AS TO MONOPOLIES. From a review of the anti-trust statutes of Illinois and of the acts passed by the legislature in 1897 it would seem that the public policy of the state of opposition to combinations and monopolies in Illinois has changed to a policy favoring combinations and monopolies.

22. COMBINATIONS AND MONOPOLIES—CONSTRUCTION OF LAWS REGULATING. The laws of trade appear to be almost as irresistible as the laws of nature. These combinations are the evolution of trade and appear to be demanded by the present economic conditions. Such laws as the legislature deem it necessary to enact in that regard should be strictly construed and enforced in favor of the public; but the constitutional right to own property and contract with reference thereto, should not be infringed or abridged except in a case where it is made clearly to appear that unless there is such interference, the public will be injuriously affected. *Held* this is not such a case.

23. Complainant, the owner of but little more than the one-hundreth part of one per cent. of the capital stock of the Pullman Company, an Illinois corporation, filed his bill on Dec. 28, 1899, for an injunction against the defendant, to enjoin it from carrying out an intended purchase of all the property of the Wagner Palace Car Company, a joint stock corporation organized under the laws of New York, and from delivering 200,000 shares ($100 each) of the capital stock of the Pullman Company as the purchase price proposed to be paid for said property. December 30, 1899, was fixed as the day for the completion of the sale. Complainant purchased his stock (100 shares) about one month before and after the call for the meeting of stockholders of the Pullman Company, on December 5, 1899, called to ratify the purchase. The motion for the injunction was heard on December 30, 1899, and denied. Thereafter the purchase was consummated, the Wagner Company dissolved, and stock of the Pullman Company issued in payment for the assets of the former. In May, 1901, a motion was made by complainant for leave to file a supplemental bill and for a

temporary injunction based upon the original bill, affidavits and answer. *Held*, that complainant is not entitled to an injunction or to any equitable relief and complainant's bill is dismissed for want of equity.

Motion for leave to file supplemental bill and for temporary injunction based upon the original bill and answer, the affidavits and documentary proof filed in support of such bill and answer, and also upon the supplemental bill proposed to be filed and other affidavits and other documentary proof submitted by the respective parties. Heard before Judge Murray F. Tuley.

The facts are stated in the opinion of the court.

*Gregory, Poppenhusen & McNab*, solicitors for complainant.

*Isham, Lincoln & Beale*, solicitors for defendant.

TULEY, J.:—

This is a bill filed by Truman A. Taylor as a stockholder against Pullman's Palace Car Company on the 28th of December, 1899, praying for an injunction against the defendant, an Illinois corporation, from carrying out an intended purchase of all the property of the Wagner Palace Car Company, a joint stock corporation organized under the laws of the state of New York, and from delivering to the Wagner Company, or to anyone for it, 200,000 shares ($100.00 each), of the capital stock of the Pullman Company, as the purchase price proposed to be paid for said property.

Some time prior to the 8th of November, 1899, the two companies entered into an informal agreement concerning the sale of the property and assets of the Wagner Company to the Pullman's Palace Car Company, which contemplated the making subsequently of a formal agreement between the parties, and on said 8th day of November said formal agreement was entered into by them, which recited, in substance, that the directors of the Wagner Company had taken appropriate action to secure the dissolution of such company, on the 30th of December, 1899, and that in consideration of the premises and of the covenants and agreements contained in such agreement, the Wagner company was to sell, assign, con-

vey and transfer to the Pullman Company all its cars, equip-
ment, real estate, plant, good will, assets and property, in-
cluding its contracts with railroad companies for the renting
of its sleeping and other cars.

In consideration of such sale, etc., the Pullman Company
was to cause its capital stock to be increased 200,000 shares,
the par value of which was $20,000,000, which shares were
to be issued and delivered to the Wagner Company, or to its
liquidating trustees, in payment of the Wagner property,
said shares to be distributed by the Wagner Company, or the
trustees, to the shareholders of said company; the Wagner
Company binding itself to make no new contracts and to pre-
serve the *statu quo* of its property, as near as might be, until
the 30th of December, next thereafter, when it was to be
delivered to the Pullman's Palace Car Company; the Pull-
man Company to assume all the indebtedness and liability of
the Wagner Company. The agreement was to be subject
to the ratification of the stockholders of the respective com-
panies.

Due notice was given by the Wagner Company of the said
agreement, and that the directors found it necessary, in con-
nection with the execution of the agreement, to dissolve the
joint stock association and that unless a majority of the
shareholders should oppose such dissolution, it would be dis-
solved on the 30th of December, 1899; and that the sharehold-
ers could take either cash at $180 per share for their Wag-
ner holdings, or an equal number of shares of stock of the
Pullman Company, as they might desire.

Due notice was given of the execution of the contract to
stockholders of the Pullman's Palace Car Company and of a
meeting of said stockholders to be held on December 5, 1899,
to vote for the ratification of the same, and to vote upon the
issuing the twenty million dollars additional stock to pay for
the property to be purchased; also to vote upon the question
of change of the name "Pullman's Palace Car Company" to
"The Pullman Company," and as to increasing the number of
directors to not less than eleven.

Only one of the shareholders of the Wagner Company made

objection to the carrying out of the agreement, towit, one Francis, who, it is alleged, was an employe and acting in the interests of the same party, who, it is contended, is the real complainant in this case. Francis applied for an injunction against the Wagner Company in the New York courts, was defeated, and his bill has since been dismissed.[1]

The complainant herein owning one hundred shares appeared at the meeting of the stockholders of the Pullman's Palace Car Company, and made formal objection to the ratification of the agreement to the increase of the stock, the change of name, and increase of directors, and was the only objecting stockholder. He purchased his said stock nearly a month after the call for said meeting was made public and—it is a fair inference from the evidence—with a view to the litigation.

The 30th of December, 1899, was fixed upon for the consummation of the purchase by the formal transfer of the property and assets of the Wagner Company in exchange for the 200,000 shares of stock of the Pullman Company. The Wagner Company was formally dissolved upon that day, the 30th of December, and its property placed in the hands of liquidating trustees.

On the 28th of December, 1899, the original bill was filed in this case, seeking to enjoin the consummation of the proposed purchase.

On the 29th of December, the Pullman Company filed its answer therein, and on the next day, the 30th, the motion of complainant for a temporary injunction to stay all proceedings to consummate said purchase, was heard upon the pleadings, affidavits and documentary evidence filed in said cause.

The original bill alleges, among other things, that the proposed purchase was for the purpose of enabling the Pullman Company to control the sleeping and parlor car business done upon the various railroads in Illinois and throughout the territory of the United States, and that the transaction, if consummated, would create a trust and monopoly controlled by

[1] *Francis v. Taylor*, 31 Misc. 187, 65 N. Y. Supp. 28; aff'd 52 App. Div. 631 (m), 65 N. Y. Supp. 1133.—Ed.

the Pullman Company, of such business operated on such railroads, and that the purchase is in direct violation of the laws and statutes of the state of Illinois, and opposed to public policy; and that its purpose was to enable the Pullman Company to swallow up and absorb its only other substantial competitor in the sleeping and parlor car business, and thereby obtain a monopoly.

The answer of defendant, while admitting some of the material allegations of the bill, denied that the Wagner Company had no right to dispose of its property and assets, and that the Pullman Company had no right to buy the same, or that the purchase was in violation of the anti-trust statutes of Illinois, or opposed to public policy; denies that the two companies were competitors in the sleeping and parlor car business, or that the object of the purchase was to enable defendant to control said business upon the railroads of the United States, and averred that the control of such business was and is in the said railroad lines, respectively, and that the sole object of the purchase and sale was the lawful and legitimate enlargement of the business of the Pullman Company; denies that it was part of the agreement between the companies that the Wagner Company should dissolve; denies any intent to establish a monopoly in said business, and avers that it is impossible that any monopoly could be established by means of such purchase, or by the action of said companies alone.

It also avers that the Chicago, Milwaukee and St. Paul Railway Company operates (as every railway company can, if it wishes), its own sleeping cars over its own railroad of over six thousand miles; that there were at the time of said purchase at least ten large car building establishments in the United States, customarily building sleeping and parlor cars, and selling them to railroad companies operating their own sleeping cars, of which said railroads there were seventeen in the United States.

Avers that the only competition possible is open to any concern or individual that may enter the field and compete for the leasing of cars to railroads, and for performing the work necessary for sleeping and parlor car operation.

On the said 30th of December, 1899, Judge Tuthill, one of the judges of this court, before whom said motion for temporary injunction was made, after argument, denied the motion.

In May, 1901, a motion was made in this cause for leave to file a supplemental bill and for a temporary injunction based upon said original bill and answer, the affidavits and documentary proof filed in support of such bill and answer; and also upon the supplemental bill which was proposed to be filed, and other affidavits and other documentary proof submitted by the respective parties to this controversy.

Some questions of practice are involved which make it necessary to review to some extent the prior proceedings.

Between the date of the order refusing the temporary injunction to-wit, the 30th of December, 1899, and March 16, 1901, except the entering of an order substituting solicitors for complainant, nothing whatever has been done in the case. On said last mentioned date a motion was made by the complainant for an order upon defendant to permit the inspection of the books of the Pullman Company, and at the same time a cross motion was made by the defendant to dismiss the original bill.

The sole object of the original bill was for an injunction against the defendant consummating the agreement of purchase entered into with the Wagner Company and delivering any shares of stock in payment therefor.

Judge Tuthill's opinion is before me, in which it is clear that he passed upon the merits of the bill—but independent of that opinion—in any case, where the sole relief sought is injunction, if the court is of the opinion that the bill does not make out a case entitling the party to an injunction, and that it is incapable of amendment so as to entitle the party to the relief sought, the court will, upon motion of either party, dismiss the bill for want of equity.

The defendant, more than a year after the decision of the motion for temporary injunction, moved to enter an order dismissing the bill on the ground that the decision of Judge Tuthill was practically a disposition of the entire case.

It is unnecessary to pass upon the motion of defendant,

because a new motion was made by complainant for an injunction based upon the original pleadings and evidence and upon the other matters set forth in a supplemental bill, and that motion made the 15th of May last should, in my opinion, take precedence over the motion of defendant to dismiss the original bill.

The complainant's motion May 15, 1901, for leave to file his supplemental bill and for a temporary injunction, was a waiver of his prior motion for a temporary injunction, and takes the place thereof. Where a motion for an injunction, or to dissolve one, is passed upon by one branch of the court, it is an improper practice to renew such motion based upon the same identical pleadings and evidence before another branch of the court.

If, after the decision of such original motion, new facts arise concerning the matter in dispute, the party has a right to renew his motion for an injunction and base the same upon the preexisting facts and pleadings in the cause and upon the new matters which must be set forth in a supplemental bill. The defendant, if such motion should be denied, could renew the motion to dismiss the bill for want of equity.

It must be admitted that the situation of the parties to this controversy had materially changed in the year and one quarter which had elapsed between the refusal by Judge Tuthill of the complainant's motion for an injunction and the making of this present motion. The original motion for an injunction was based upon an executory contract, which was about to be carried into execution, but the present motion is for an injunction upon executed contract; the same contract, but fully executed by both parties, since the denial of the original motion.

In the numerous affidavits filed in this case are found affidavits tending to show that the complainant is not the real party in interest in this litigation. The complainant contends that the court cannot, upon this motion, or in this litigation, inquire into that question, but has filed no affidavits in reply to defendant's affidavits upon that point. The affidavits filed on behalf of defendant tend to show that the complainant is

not the real party in interest in this litigation, but that he is acting at the instigation of a gentleman, a resident of Boston, Massachusetts, who instituted, in a court in New York City, suit for an injunction in the name of one Francis (a clerk in his office), as a stockholder, against the Wagner Company carrying out the transaction in question. It appears that the New York suit failed, and that said stockholder, Francis, has since acquiesced in this purchase and sale to the extent of withdrawing all opposition to it. It must be admitted that the affidavits filed make a *prima facie* case against the complainant as to this contention—that complainant is not the real party in interest; that this suit is not prosecuted in good faith, but is an attempt to force the defendant to buy the shares standing in complainant's name at an exorbitant price, and is a mere speculative bill in equity. The complainant insists that even if defendant's contention is true, such fact cannot deprive the party holding the legal title (that is, the complainant herein) of the right of applying to a court of equity for the enforcement of his rights as a stockholder; that no matter what complainant's motive may be (whether it be to gratify his own malice, or to "sandbag"—as is alleged—the defendant company, or to allow others to do the same thing) he has a right to be heard as a stockholder of the Pullman Company.

Upon a motion for a temporary injunction—the issuance of which is largely a matter of discretion of the chancellor—the court would cease to be a court of equity and conscience if it did not take into consideration such a motive of the complainant, or of the real party in interest.

At common law a party could be indicted for prostituting the process of a court of justice to his own private or unlawful purposes, and punished therefor. Shall it be said that a party may use a court of equity, a court of conscience, for the accomplishment of improper or unlawful purposes, and actually accomplish such purposes by means of the strong arm of the court of conscience?

Our own supreme court have held that where there is a fraudulent combination of debtor and creditor to defraud

other creditors, the fact that they use a court of chancery— by means of a creditor's bill, receiver, and a sale by said receiver—to accomplish such purpose was as much a fraud as it would be to accomplish the same purpose by any other means; that such fraud, when proven, would vitiate the entire legal and equitable proceedings used in the accomplishment thereof. *Butler Paper Co. v. Robbins,* 151 Ill. 588.

There are some authorities to the effect that the motives of a stockholder in filing such a bill cannot be inquired into; that it is sufficient if he has the legal title to the stock, but whatever may be his rights as a stockholder, in a suit at law, when he comes into a court of equity, asking that the chancellor, in the exercise of a judicial discretion, shall give him the aid of the strong arm of the court to accomplish such an improper, illegal or criminal purpose, a different question is presented. The writ of injunction is the strong arm of the court, but it is wielded and controlled by the conscience and discretion of the chancellor, and its use for improper or unlawful purposes will not be permitted.

Another question that arises in this case, and is set up by the answer, is the question of the laches of the complainant in the prosecution of this suit. This presents the question whether there is not a *quasi*-estoppel upon complainant as to his remedy by injunction.

The original bill in this case did not make the Wagner Company a party defendant. It was not a necessary party defendant, but it could have been made a defendant as a proper party defendant. The failure of the complainant to make the Wagner Company a party defendant must be taken into consideration, because, as set forth in the supplemental bill, the Wagner Company has been dissolved, the contract between it and the Pullman Company has been consummated, all of the property, assets, etc., of the Wagner Company have been turned over to the Pullman Company, and the Pullman Company has issued to the Wagner Company, or to the trustees in liquidation, 200,000 shares of stock, purchase money therefor, which had been placed and sold for more than a year in open market.

During this delay this 200,000 shares of stock have been changing hands, but to what extent was not, and could not be shown.

At any time since December, 1899, the known or unknown holders of said stock could have been brought in as parties defendant, the unknown could have been made defendants as "the unknown holders or owners" of the stock.

The complainant contends that he was not guilty of laches in failing to bring in the holders of this twenty millions of stock, because, he alleges, they were represented by the Pullman Company when they became such holders, but this could not be if complainant's contention is true, to-wit: that the whole twenty millions of dollars issue of stock is void. If the stock is void, they never became stockholders; if it is valid, they are *bona fide* stockholders, and the whole foundation of complainant's suit is gone.

"There is a *quasi*-estoppel known to equity which does not cut off a party's title nor his remedy at law; it simply bars his right to equitable relief, and leaves him to his legal action alone. The equitable remedy to which this *quasi*-estoppel by acquiescence most frequently applies, is that of injunction, preliminary or final," etc. (See Pomeroy's Equity Jurisprudence, sec. 817).

It must be admitted that this doctrine has usually been applied to cases where one stands by and sees works which create a nuisance, erected, without making any protest, or to be operated for a length of time without his seeking the aid of an injunction, but the principle is applicable to this case, where the complainant has stood by and witnessed this stock put upon the market and traded in publicly for more than a year, without making any move in this suit to prevent it; has allowed his alleged rights as a stockholder to be infringed during all that time.

He has slept upon his rights by failing to prosecute this suit, until there has arisen a *quasi*-estoppel to his relief by injunction, if any he ever had.

The laches of complainant, in the prosecution of this suit, has been so gross that it might be held to justify a stockholder,

who had actual notice of the proceedings of the case, in believing that the complainant had abandoned his case or had, at least, abandoned his right, if any he had, to a remedy by injunction.  *Norris v. Ile,* 152 Ill. 190.

The laches of complainant in the prosecution of this suit appears to be absolutely inexcusable.  The attempted excuse that complications arose by reason of the change of solicitors, and that he did not know what his solicitors were dong in the case, is not worthy of consideration.

The complainant seeks to avoid the effect of his inexcusable laches by invoking the doctrine of *lis pendens,* contending that as this suit was pending against the Pullman Company when the twenty millions of stock was issued and placed upon the public market, the original parties to whom it was issued, and all persons buying the same on market overt, take with constructive notice of the pendency of the suit and subject to future proceedings therein.

The greatest of all writers upon Equity Jurisprudence, Pomeroy, in speaking of *lis pendens* as notice, says:

"The effect of the suit, as notice, continues through the entire time of its pendency, and ends with the final judgment. In order, however, that a purchaser *pendente lite* may be thus affected the suit must be prosecuted in good faith, with all reasonable diligence and without unnecessary delay." (Pomeroy, sec. 634, *et seq.,* and cases therein cited).  *Norris v. Ile,* 152 Ill. 190.

If the affidavits submitted by the defendant and not contradicted by complainant, upon the question of the good faith of complainant in the prosecution of this suit, are true, the "good faith" is woefully lacking and gives ground for the suspicion that the delay in the further prosecution of this suit was for the purpose of permitting greater complications to arise in order that the defendant might be forced to purchase the shares nominally represented by complainant, at a still more exorbitant price.  The continued prosecution of the suit, "in good faith, with all reasonable diligence, and without unnecessary delay," it must be admitted, is not shown by the evidence before the court.

A neglect to comply with these requisites "would relieve a purchaser from the effect of *lis pendens* as notice." (Pomeroy, sec. 435).

It follows from what I have already declared, that the holders of the twenty millions dollars of stock are necessarily parties to the supplemental bill proposed to be filed and that the motion for a temporary injunction must be denied.

Counsel for complainant has stated in his argument that if the court, upon the merits of the case, was of the opinion no permanent injunction could issue, he did not desire a temporary injunction.

The argument in this case has been as if it was on final hearing, and I am of the opinion that I should pass upon the merits of this case as shown by the affidavits and evidence produced upon these motions.

The first question is: Was the transaction in question, the alleged purchase by the Pullman Company of the cars, plant, contracts and good will of the Wagner Company, *ultra vires* the charter power of the Pullman Company, and therefore utterly null and void?

The charter of the Pullman Company, sec. 4, provides: "The said corporation shall have power to manufacture, construct, and purchase railway cars with all convenient appendages and supplies for persons traveling thereon, and the same may sell or use or permit to be used in such manner and upon such terms as the company may think fit and proper."

Section 1 creates certain parties into a body politic under the name and style of "Pullman's Palace Car Company," "with all the powers, rights, privileges and immunities incident to such corporations and necessary or useful for the purposes of this act."

Section 6 gives the corporation power to purchase real estate necessary for its uses and the right to purchase railway cars without limitation as to the number, or as to the party from whom the purchase may be made.

Treating the transaction—as contended by defendant—to be a purchase by the Pullman Company, and that in making such purchase, its sole purpose and intent was the lawful and

legitimate enlargement of its business, would it be *ultra vires* the charter of the Pullman Company, or illegal, unless thereby some law was violated or such purchase would be against public policy?

Considering solely the charter powers of the Pullman Company (and conceding the power of the Wagner Company to sell), the Pullman Company, immediately upon its organization, finding the Wagner Company willing and having power to sell, could have made a purchase such as the one in question, "as incident to, necessary, and useful," to it in the commencement of its business operations.

If it could do so, to start its business operations, no reason is perceived why it could not make such purchase at any time thereafter, if such purchase was considered necessary or useful in carrying on the business of the corporation.

Whether such a purchase would be necessary or useful to the carrying on of the business of the Pullman Company was for the managing board, the board of directors, to determine.

There is no bad faith charged against this board of directors. It is true that it is alleged that the price paid was at least double the value of the property purchased, but in the absence of a charge of *mala fides* on the part of the board of directors, the allegation is of no importance. An honest mistake of directors as to values gives neither the state nor any stockholder a ground of action.

The court cannot uphold the contention that the purchase of the Wagner Company's contracts or leases with the railroad companies would, in any event, be beyond the charter power of the Pullman Company. The power to purchase cars and lease the same to railroad companies, confers power to purchase cars which are already leased to railroad companies, and such purchase, with the assignment of such leases, was substantially the same as to make a purchase and then to lease the cars. It is doing indirectly what was authorized to be done directly, and comes within the spirit of the charter powers.

It follows that if such a purchase could be made under any circumstances, the purchase in question, conceding it to be a

purchase in fact, was not *ultra vires* the charter powers of the Pullman Company, *ex facie* the charter. It might be an abuse of the charter power, but not an *ultra vires* act.

As to whether such purchase was in violation of the anti-trust laws, or was *ultra vires* because opposed to public policy, will be discussed hereafter, but before doing so, I shall consider the contention that even if the Pullman Company had the power, under its charter, to make this purchase, the Wagner Company had no power to sell all of its property, the assets, contracts, etc., and that if the contract of sale was *ultra vires* as to the Wagner Company, it was also *ultra vires* as to the Pullman Company.

Neither the Wagner Company, nor any of its stockholders nor persons receiving or holding any of the twenty million dollars' worth of stock issued by the Pullman Company in payment to the Wagner Company, are made parties to this litigation.

The Wagner Company has been dissolved and the holders of such stock are the only persons who can, by any method of reasoning, be held to stand in its place. The proposition itself shows the necessity that the holders of such stock should be made parties to the supplemental bill.

It is no part of the duty of a court of equity to cloud titles or inflict injury upon persons not parties to a litigation in order to give relief to the litigant party before it. A stockholder in one corporation has no footing in a court of equity to enforce purely public, or redress purely private rights as to or in connection with alleged *ultra vires* acts of another corporation. That is left to the people of the state under which the corporation had its charter, or to the stockholders or creditors having an interest.

A stockholder has a standing to question the *ultra vires* acts of his own corporation by which he may be injured, because of the trust relation existing between him and the corporation, but there was no trust relation between this complainant and the Wagner Company.

If the complainant cannot challenge the *ultra vires* act of his own corporation successfully, he is, in my opinion, with-

out remedy. If the act of the Wagner Company was *ultra vires* its charter, there are equities connected with such *ultra vires* acts which would estop the stockholders from setting up the same as against the Pullman Company; as, for example, the Wagner Company, or its stockholders, having received the proceeds of such *ultra vires* act, it or they would be compelled, upon coming into a court of equity, at least to tender what had been so received before seeking equity as against such *ultra vires* act.

It is not necessary in the view I take of the power of the Wagner Company, to decide whether this equitable doctrine must be applied to the Pullman Company, if complainant should succeed in having the twenty millions worth of stock declared void and of no value.

Admitting that complainant has the right to raise the question as to the transaction being beyond the power of the Wagner Company, the question that first arises is, whether the Wagner Company had the right to dissolve. It must be admitted that it has ceased to exist as a *de facto* joint stock association, and that it would be impossible to restore the *statu quo* as it existed prior to its dissolution.

It is, however, contended that it had no right to dissolve, as it was engaged in a business affected with a public interest. It is true that a corporation chartered to carry on a business affected with a public interest is under an obligation or duty to carry on such business during the life of its charter and not to discontinue its business and dissolve, except with the consent of the state, but the law under which the Wagner Joint Stock Association was organized expressly provides that a joint stock company or association organized under that law, *may be dissolved in pursuance of its articles of association,* and its articles provide for its dissolution upon sixty days' notice to be given.

Such notice was given, the Wagner Company was dissolved and it is dead, beyond the power of any court to resurrect it.

Grant that it was organized to subserve a public purpose and was under an implied obligation to continue to do so.

There is a limitation to that obligation, granted by the state, its creator, to-wit, that it should serve the state until it chose to dissolve itself in pursuance of its articles of association.

That power to dissolve itself when it wished, without asking the consent of the state or any judicial authority, may have been the chief reason why its stockholders invested their money therein. However much it may be said that the Wagner Company resembled a corporation in other respects, in this power to dissolve at will, to sell at will and dispose of its assets at will, it had all the rights of an ordinary copartnership.

There is no limitation upon its right to dissolve by its contract with the state, nor is there any implied obligation that it will not dissolve for the purpose of selling its property, or for the purpose of enabling its shareholders to sell their interest in such property, for cash or for the stock of some other corporation.

If any of such acts are prohibited or illegal, it must be because they were a violation of some statute law or of some public policy.

The complainant relies upon the authority of the case of the *Central Transportation Company v. Pullman's Palace Car Company*, 139 U. S. 24, which its learned counsel declares to be practically upon all fours with the case at bar. It is not necessary to do more than to state the facts of that case and to refer to a few points of difference in the two cases.

The Central Transportation Company was "a corporation," formed by articles of association under the general laws of the state of Pennsylvania, concerning manufacturing companies, with a certain capital stock, for twenty years, for "the transportation of passengers in railroad cars constructed by said company," under certain patents. It carried on a sleeping car business similar to that carried on by the Wagner Company. Seven years after its incorporation, the legislature extended its charter for ninety-nine years and empowered the corporation to double its capital stock, and "to enter into

contracts with corporations of that or any other state for the leasing or hiring or transfer to them, or any of them, of its railway cars and other personal property.''

The company forthwith entered into contract with the Pullman Palace Car Company, by which it leased and transferred all its cars, patents, assets of every description to the latter company for ninety-nine years, and covenanted ''not to engage in the business of manufacturing, leasing, or buying sleeping cars,'' during the term of the lease, the Pullman Palace Car Company agreeing to pay the Transportation Company $264,000 per annum during the entire term of the lease.

The supreme court of the United States held that the contract was unlawful and void, *involving an abandonment* of its duty to the public, and therefore no action could be maintained to recover money due under the lease for the year ending July 1, 1886.

The court says that upon the authority and the duty of a corporation to exercise the powers granted to it by the legislature and those only, and upon the invalidity of any contract made beyond those powers, or providing for their disuse or alienation, there is no need to refer to decisions of other courts than its own. It then reviews many of those decisions.

The court appears to lay particular stress upon the fact that the purpose of the incorporation of the plaintiff, the Central Transportation Company, was the ''transportation of passengers,'' whereby it exercised a public employment and became a *quasi*-public corporation, and bound to perform such duty during the term for which it was incorporated.

Under its charter, the transportation of passengers in its own cars would undoubtedly be held to be the act or transportation by the Central Transportation Company, and it was immaterial what its arrangement was with the railroads.

In the case of the Wagner Company, it was not organized for ''the transportation of passengers,'' and the transportation of passengers in its cars would be the transportation by the railroad companies with whom it might contract.

The Central Transportation charter ran for ninety-nine

years. It could not abdicate its powers of its own will. The Wagner Company could.

In the Central Transportation Company case, that company attempted to sell all its property, and to cease to perform its duties, and continue in its existence for ninety-nine years solely for the purpose of receiving and paying over to its stockholders the rent it was to receive from the Pullman Company.

This of course it could not do as it was under implied obligation to the state to perform, during its existence, the duties for which it was incorporated during the term of its existence.

It did not attempt to dissolve; it had no right to dissolve by its own action.

The Wagner Company was not under duty to the public to continue its existence for any specified term; it had a right to dissolve of its own motion at any time, and did dissolve.

In that case, the supreme court held that it appeared upon the face of the agreement that the object was to prevent competition, and that the duties of the Central Transportation Company should be performed by the Pullman Company.

It is, however, argued in the case at bar, that the transaction was not a purchase and sale in fact, and a court of equity will look at the substance and disregard the form used by the parties. There is no doubt of that proposition, and it is one of my favorite maxims. Therein lies the greatness of the court of equity, and its great superiority over a common-law court.

Granting that the method pursued was only an indirect way taken by the Wagner Company, or by its stockholders, to combine their property with that of the Pullman Company, and to continue it in substantially the same business, was it an unlawful act of both or either of said companies? Was it prohibited by the anti-trust statute of Illinois of 1891, or the Federal anti-trust act of July, 1893, or was it opposed to public policy?

There can be no doubt but that the charter powers of the two companies were substantially the same, so far as the leas-

ing of cars and the providing of sleeping, parlor and dining car accommodations on different railroads; that the business of each was similar, but that the Pullman business was more extensive and particularly in the manufacture of cars.

The charter of the Pullman Company gives the right to carry on the business, known as the sleeping and parlor car business, in which it has been engaged, and in which the Wagner Company was also engaged, but it confers no power as to the transportation of passengers, or to run a line of railway or cars with its own motive power. Its business is not independent of, and cannot be, but is only accessory to that of the railroad companies.

A railroad company is under an obligation and duty to furnish transportation to the public and to furnish all known appliances.

The railroad may furnish sleeping, parlor and dining cars, but whether it can be compelled to do so, it is unnecessary to decide. It may furnish its own cars and operate the same if it desires to do so, or it may lease cars and contract for service to be rendered in connection with the running thereof, with any person or corporation that it sees fit, upon such terms and conditions as may be agreed upon. When it leases cars from the Pullman Company and contracts with it for the employment of service in connection with the running of said cars, the transportation and the accommodation in connection therewith rendered, is that of the railroad company. The obligation or duty as to such transportation is upon the railroad company; the franchise exercised is that of the railroad company.

It does not appear that the Pullman Company has any exclusive patents for sleeping cars or has a monopoly of the raw material or of the art of manufacturing sleeping cars. It would be difficult, if not impossible, for the Pullman Company to obtain a monopoly of the sleeping car business without the co-operation of the railroads.

There is no allegation charging that the railroads are combining with the Pullman Company to enable the latter company to obtain such a monopoly. The Pullman Company has

no franchise to require or demand of the railroad companies, or any of them, to lease its cars or haul its cars, or that the Pullman Company shall operate any sleeping or parlor cars attached to any railroad train. It only obtains such rights by contract with the railroad company. It is under no public duty, by the letter of its charter, to furnish sleeping cars or parlor cars, to run them or to operate them. After it has contracted to furnish such cars for a railroad company and the accommodations connected therewith, it is then in the performance of such contract and it may be performing a service in which the public is interested, but it arises from its voluntary contract with the railroad company and not from any public obligation or duty imposed upon it by its charter.

Both the railroad company and the Pullman Company, in performing such service, are subject to legislative regulations as to such service and the charges therefor.

It may be true (but it is denied in defendant's answer) that by the transaction in question the Pullman Company gets rid of its chief competitor in the business of leasing sleeping and parlor cars to railroad companies and performing service in connection with such cars, but that does not enable the Pullman Company to limit or reduce the operation or the number of sleeping and parlor cars upon the railroads of the United States, or to control and change the price for such accommodations throughout the United States. While its chief competitor may have been removed by reason of this purchase, yet the right to contract in that respect with railroad companies is open to all, and it is shown that there are a large number of companies and corporations competent and able to compete with, and competing with the Pullman Company in leasing to the railroads sleeping and parlor cars, and furnishing the necessary conveniences and labor connected therewith.

It is not every combination that is prohibited by the anti-trust laws, or that is opposed to public policy.

It will be admitted that one merchant may buy out the stock of another and unite it with his own, or the two may combine their stocks and form a co-partnership, or may combine their stocks and one take only a percentage of future

profits agreed upon. This may, and does, lessen competition and does not necessarily increase prices or prevent competition. What can be done by individuals as such may be done by co-partnerships, by mercantile or unincorporated associations or companies. Not only may contracts of this nature be made, but covenants not to engage in business within a limited number of years, or at the same place, have uniformly been sustained by the courts, as not being an unreasonable restraint of trade and held to be lawful. In the Diamond Match Company case it was not only held that one party may legally purchase the trade and business of another, for the very purpose of preventing competition, but also a covenant not to engage in the same busness in the United States (excepting therefrom Nevada and Montana) was upheld. *Diamond Match Co. v. Roeber,* 106 N. Y. 473.

The right to hold property and to contract in reference thereto is protected by the constitution of this state, and by most of the states, if not all, in the Union.

Our supreme court, in construing sec. 2, art. 2, of our state constitution, "no person shall be deprived of life, liberty or property without due process of law," declares in *Ritchie v. The People,* 155 Ill. 98, 104, that "the privilege of contracting is both a liberty and a property right," and that the right to use, buy and sell property and contract in respect thereof is protected by the constitutional clause quoted. Also that "hence the right to make contracts is an inherent and inalienable one, and any attempt to unreasonably abridge it is opposed to the constitution," and cites with approval the case of *Leeps v. St. L., I. M. & S. Ry. Co.,* 58 Ark. 407, which holds "where the subject of contract is purely and exclusively private, unaffected by any public interest or duty to persons, to society or government, and the parties are capable of contracting; there is no condition existing upon which the legislature can interfere for the purpose of prohibiting the contract or controlling the terms thereof." (*Ritchie v. People,* 155 Ill. 98, 109.) In *Frorer v. People,* 147 Ill. 171, the court, in construing our constitution as to the same article, says: "So, under what is denominated the 'police power'

laws may be constitutionally enacted imposing new burdens on persons and property, and restricting personal rights of enjoyment of property, where, in the opinion of the general assembly, the public welfare demands it—under which may be instanced license laws, * * * fire limits * * * laws to prevent monopoly, etc.''

It must be admitted that all so-called anti-trust laws, all laws to restrain or interfere with the freedom of contracts, are the exercise of the police power, and that the only justification for such laws is that the public welfare, the interests of the public demand their enactment. But they must be read and construed, in the light of the constitutional guarantees of the right to hold property and contract with reference thereto.

The original anti-trust act, passed in 1891, has been held by our supreme court to be a valid exercise of the police power, and therefore constitutional. (*Harding v. Am. Glucose Co.,* 182 Ill. 551.)

But the anti-trust legislation of this state since 1891 has been of such a character as to raise doubts as to what is now the law of this state upon that subject. Whether this confusion has been made by the friends or the enemies of such legislation is a matter of doubt.

The vital prohibition as to trusts and combinations, which has been so vigorously upheld by our supreme court, is to be found in section 1 of the act of 1891, which originally read as follows:

''If any corporation organized under the laws of this or any other state or country, for transacting or conducting any kind of business in this state, or any partnership or individual or other association of persons whosoever, shall create, enter into, become a member of or a party to any pool, trust, agreement, combination, confederation, or understanding with any other corporation, partnership, individual or any other person or association of persons, to regulate or fix the price of any article of merchandise or commodity, or shall enter into, become a member of or a party to any pool, agreement, contract, combination or confederation to fix or limit the amount or quantity of any article, commodity or merchandise to be man-

ufactured, mined, produced or sold in this state, such corporation, partnership or individual or other association of persons shall be deemed and adjudged guilty of a conspiracy to defraud, and be subject to indictment and punishment, as provided in this act.'' (Laws Ill. 1891, p. 206.)

This was amended by the act of 1897, which re-enacted, word for word, said section 1, and added the following proviso:

''Provided, however, that in the mining, manufacture or production of articles of merchandise, the cost of which is mainly made up of wages, it shall not be unlawful for persons, firms or corporations doing business in this state to enter into joint arrangements of any sort, the principal object or effect of which is to maintain or increase wages.'' (Laws Ill. 1897, p. 298.)

The effect of this very peculiar amendment or attempted amendment has not been before the supreme court to my knowledge.[1] The question came before three judges of this court,[2] two of whom held that the amendment rendered the entire section inoperative and void, while the other, the writer of this opinion, held the amendment itself to be a violation of the constitution, therefore without effect, leaving section 1 as originally passed in full force. Assuming the original section 1 of the act of 1891 to be in full force, was the transaction in question obnoxious to its provisions?

I have heretofore in this opinion pointed out the bearing of the case of the *Central Transportation Company v. Pullman's Palace Car Company*, 139 U. S. 24, upon the transaction in question, and it will not be necessary to consider that case further in this connection.

Nor do I regard the case of *Elkins v. C. & A. Ry. Co.*, 36 N. J. Eq. 5, as in any manner controlling the transaction in question. That case, which is much relied on by com-

---

[1] The amendatory act of 1897 has since been held unconstitutional in *People ex rel. v. Butler Street Foundry & Iron Co.*, 201 Ill. 236.—Ed.

[2] *Richards & Kelly Mfg. Co. v. People*, 1 Ill. C. C. 171, *infra.*—Ed.

plainant, was a case where one railroad company absorbed by purchase a parallel railroad, thereby putting it in a position where it could control the traffic tributary to both railroads. It necessarily resulted in a monopoly as to carriage and transportation between the points upon said two railroads and enabled the railroad which had absorbed the other to raise prices at will. It was so evidently an *ultra vires* act of the absorbing road, and so evidently against public policy, that no attempt was made to justify the purchase or the absorption, but the only effort to sustain it was the contention that it came within the provisions of the state statute allowing consolidation in certain cases.

As has been heretofore shown, the purchase or combination of the Pullman Company with the stock and property of the Wagner Company, did not necessarily give the Pullman Company the power to increase prices or prevent competition in the business of contracting with railway companies for the use of sleeping cars and furnishing accommodations connected therewith, and that it was the purchase and absorption by a corporation of a joint stock association having power at will to dissolve itself and sell its property, in which respect it had all the right and power of an ordinary co-partnership.

Much reliance is placed by complainant upon the case of *Harding v. Am. Glucose Co.*, 182 Ill. 551.

The only application of that case to the one at bar is the decision of the court as to what constitutes a trust or combination in violation of the Illinois anti-trust act of 1891.

In that case there was a scheme among six corporations to unite their properties in one corporation, to be created to carry on the business formerly done by the six companies, being all the corporations engaged in the business within the glucose corn belt, except one small concern. The court held that if the scheme was consummated, it would necessarily result in the suppression of competition and create a monopoly in the new corporation, and that the new corporation would necessarily then possess power to limit production and control prices.

The scheme in the case at bar (if there was any scheme)

was for the Pullman Company to absorb the Wagner Company, which was to dissolve, and thereby prevent competition between the two companies, but there were left all the railroad companies and a score or more of manufacturing companies that might compete for, or engage in competing for, the sleeping car business of railroads. Nor, as in that case, did the scheme, being carried into effect, vest the Pullman Company with the power and discretion to raise prices at any time it saw fit to do so. It may be true that the Pullman Company has such a commanding influence in the business that with the consent and co-operation of all the railroad corporations it could raise prices, but it is not charged that there has been such co-operation, or that such is in contemplation, nor that there was any combination with any railroad for any such purpose.

In my opinion, such co-operation or combination of the defendant and a railroad company, is not, in the nature of the railroad business, likely to occur. The effect of such a combination would be to increase the cost of transportation, thus making the cost of transportation in excess of that upon other competing roads.

The effect of absorption of the Wagner Company was not substantially a wiping out of all competition, as was the scheme in the Glucose case (*Harding v. Am. Glucose Co.*, 182 Ill. 551, *supra*).

Now, did the transaction create, as alleged, a virtual monopoly of the sleeping car business?

It is not sufficient, in my opinion, under the authorities, that the transaction challenged may tend to restrain competition or tend to create monopoly. Every purchase by one merchant of the stock of another tends to lessen competition. One manufacturer may buy out the plant of another; that also tends to lessen competition in that line of manufacture, but to hold that this could not be done is, as stated before, to destroy all freedom of commerce and to violate or infringe upon the rights of parties to make contracts in respect of their property.

Treating of anti-competitive contracts, Spelling says: "It

is only when such contracts are publicly *oppressive*, that they become unreasonable. * * * 'All the cases, ancient and modern, agree that a combination the tendency of which is to prevent *general* competition, and to control prices, is detrimental to the public, and, consequently, unlawful.' " Spelling, Extraordinary Relief, sec. 1821.

The authorities, I regard as laying down the rule that the transaction complained of must necessarily put the purchaser in the position where he can, if he desires, create a monopoly,— put him in a position where he substantially controls the general market, and at his will he may raise prices or limit production, or, if the combination complained of arises from a trust or other agreement between the parties, such agreement must expressly or impliedly confer power to accomplish such results, or it must be evident upon the face of the transaction, together with the surrounding circumstances, that such was the object and intent of the parties thereto. Any other rule would be to impose an undue and unwarranted restriction upon the acts and rights of the parties, and upon the freedom of commerce.

It is contended that the transaction in question violated the Federal act entitled "An Act to Protect Trade and Commerce Against Unlawful Restraints and Monopolies," passed July 2d, 1890.

Much that has been said in this opinion showing that the transaction in question did not violate the anti-trust laws of the state of Illinois is directly applicable to the question presented by the Federal act referred to, and it is not necessary to repeat the same in this connection.

The case of *United States v. Trans-Missouri Freight Association*, 166 U. S. 290, and *United States v. Joint Traffic Association*, 171 U. S. 505, are cited and relied upon by complainant's counsel. The agreements in each of these cases, which were condemned by the United States court, were agreements among a large number of railroads, and practically all the railroads engaged in the freight business through and over a certain district or territory in the United States, by which all freight rates were fixed by a committee chosen by the par-

ties to the agreement, which the court held constituted a com-
bination of public service corporations into one powerful and
consolidated association for the purpose of stifling competi-
tion among themselves.

The court, in the later case (the 171st U. S.) considered
the agreements passed upon in the prior case (the 166th U. S.)
and held that they were substantially the same, and that the
"natural and direct effect of each of the agreements was the
same, viz., to maintain rates at a higher level than would
otherwise prevail."

There may be language in these cases, which, when taken
disconnected from the case, might appear to be applicable to
the case at bar, but the facts, the agreement in the transaction
in question in this case and those in the cases in the 166th and
171st U. S., referred to, are so dissimilar as to render those
cases of but little weight in the decision of the case at bar.
The transaction in question does not, in the opinion of the
court, violate any provision of the United States statute re-
ferred to.

As to the contention that the transaction was against public
policy, and therefore void, public policy has been defined as
follows:

"By 'public policy' is intended that principle of the law
which holds that no subject can lawfully do that which has a
tendency to be injurious to the public, or against the public
good, which may be termed the policy of the law or public
policy in relation to the administration of the law." [1]

"Public policy," it must be admitted, is a very indefinite
term, and in deciding whether a particular transaction con-
travenes it, the court has a great latitude in the application
of the doctrine.

Spelling very aptly says: "No reliable rules for determin-
ing to what extent competition may be suppressed or bought
off, without contravening public policy against monopolies,
can be laid down. Virtually the same state of facts have, in

---

[1] Per Lord Brougham in *Edgerton v. Brownlow*, 4 H. L. Cas. 1.—
Ed.

different courts, led to opposite decisions. This must, of necessity, ever be so, while so indefinite an idea as that designated by the term 'public policy' is made the test and basis of decisions. The character of institutions, the temper of the people, and the peculiarities of the business and industries in which they are engaged within the jurisdiction where the question arises, have their separate and combined influence in shaping the policy of the state, and the view of courts. Much more do local statutory and constitutional provisions affect the question." Spelling, Extraordinary Relief, sec. 1821.

The public policy of our state as manifested by the act of 1891 has been held by our supreme court to be that of opposition to all combinations in restraint of trade, or to limit production, control prices, or to create a monopoly. *Ford v. Chicago Milk Shippers' Ass'n,* 155 Ill. 166.

"The public policy of a state is to be found in its statutes, and where they have not directly spoken, then in decisions of the courts. * * * When the legislature speaks upon a subject upon which it has the constitutional power to legislate, public policy is what the statutes by it indicate." *United States v. Freight Ass'n,* 166 U. S. 290; *Harding v. Glucose Co.,* 182 Ill. 551, *supra.*

The courts cannot permit that to be declared against public policy which the state permits to be done. To permit the courts to declare that to be illegal and void which is authorized by the legislature of the state, would be to substitute the courts for the legislature. As the legislature dictates what shall be the public policy of the state, it may be interesting to inquire what "public policy" has been indicated by the legislature of our state, since the passage of the act of 1891, which has been so vigorously upheld by our supreme court in the decisions heretofore cited.

In 1893, the legislature of this state passed an act defining trusts—already comprehensively defined in the act of 1891.

There was no necessity for such a law, and by some strange oversight (or intentionally) the act of 1893 failed to prohibit the formation of trusts. Purporting to be a revision of the

subject-matter of "trusts," it is contended by many that it operated to repeal the act of 1891.[1]

In 1897, the legislature added to section 1 of the act of 1891 the proviso to which I have heretofore referred. If this proviso is constitutional, it is expressly made lawful for all persons, firms or corporations, engaged in mining, manufacturing or production of merchandise, the cost of which is mainly made up of wages, to enter into *any joint arrangement,* the principal object of which is·to maintain or raise wages.

The bill in this case fails to allege that the Pullman Company and the Wagner Company do not come within the terms of said proviso.

The same legislature passed an act ratifying the combinations, consolidations and agreements of all railroad companies made between July 1, 1874, and July 1 1883.[2]

The same legislature also passed an act authorizing city councils to extend for the term of fifty years ordinances granting rights to construct and operate street railways in the public streets of cities, towns, etc.; and providing that there should be no grant to any other corporation, except with the consent of the owners of a majority of the street frontage on the street to be occupied and giving any property owner the right to an injunction to prevent the laying of any such tracks in the street without a full compliance with the requirements of the law as to street frontage.[3]

The latter provision was intended to give existing street railways a monopoly.

The same legislature passed an act allowing all gas companies doing business in the same city, town, etc., to consolidate and merge into a single corporation. It is clearly apparent upon the face of this act that it was intended to give existing gas companies a monopoly in the furnishing of gas in the cities, towns, etc., of this state.[4]

[1] The Act of 1893 was held unconstitutional in *Connolly v. Union Sewer Pipe Co.,* 184 U. S. 540.—Ed.

[2] Laws of Illinois, 1897, page 281.—Ed.

[3] Laws of Illinois, 1897, page 282. This act was repealed by Act of March 7, 1898, Laws of Illinois, 1899, page 331.—Ed.

[4] Laws of Illinois, 1897, page 177. This act was held constitu-

It also passed a separate act intended to protect existing gas and electrical lighting companies from competition by new companies, by requiring the consent of the owners of a majority of the frontage of the streets and alleys to be occupied, and giving individuals the right to litigate the question of frontage by injunction.[1]

The same legislature also passed an act expressly giving grain warehousemen in Chicago the right to buy, own and store their own grain in their own warehouses mixed with that of their customers; which practice, under a prior law, the supreme court of the state declared tended to create a monopoly in the owners of warehouses [2] (*Central Elevator Co. v. People,* 174 Ill. 203).

The storm of indignation aroused in the state by the attempt to give a monopoly to the street railways for fifty years caused a repeal of that law, but the others remain in full force.

· The legislation I refer to would seem to indicate that the "public policy" of the state, of opposition to combinations and monopolies has changed to a public policy favoring combinations and monopolies.

Unless a court can see that some existing *anti*-trust statute has been violated, any decision founded upon the theory that the "public policy" of the state is that of opposition to trusts and combinations would reflect more the individual leaning of the judge than the public policy indicated by the legislation of this state since 1891.

In conclusion, no case has been cited, and the court knows of none, which can be said to be similar to the case at bar. The precise questions herein have never been determined.

As said in the section of Spelling before referred to, "The most important factor of commercial life is the liberty of contracting, and it should not be abridged except when it is made

tional in *People ex rel. v. People's Gas Light & Coke Co.,* 205 Ill. 482.—Ed.

[1] Laws of Illinois, 1897, page 100.

[2] Laws of Illinois, 1897, page 302. This act was held unconstitutional in *Hannah v. The People,* 198 Ill. 77.—Ed.

clear that the public will be injuriously affected by its unrestrained exercise in a particular case,'' (Spelling on Extraordinary Relief, sec. 1821).

The laws of trade appear to be almost as irresistible as the laws of nature. These combinations are the evolution of trade and appear to be demanded by the present economic conditions. Whether they should be absolutely prohibited or merely regulated in the public interests is more of an economic or political question than a judicial one.

Such laws as the legislature deem it necessary to enact in that regard should be strictly construed and enforced in favor of the public; but the constitutional right to own property and contract with reference thereto, should not be infringed or abridged, except in a case where it is made clearly to appear that unless there is such interference, the public will be injuriously affected. This is not such a case.

The court has passed upon the right of this complainant—who owns but a little more than one-hundredth part of one per cent. of the capital stock of the Pullman Company—to relief in a court of equity, and has held that upon the pleadings, affidavits and documentary evidence in the case, that he is not entitled to an injunction or to any equitable relief.

The question whether or not the complainant has the right to recover at law from the Pullman Company, or its directors, his damages, if any, which he has suffered—by reason of the transaction complained of in his bill filed herein—has not been considered by the court.

The order, therefore, will be that complainant's motion for leave to file the supplemental bill tendered and his motion for a preliminary injunction are both denied; that the court, being of the opinion that complainant's bill is incapable of amendment so as to entitle him to any equitable relief, the defendant's motion to dismiss complainant's bill for want of equity is granted and that complainant's bill be dismissed for want of equity, at complainant's costs, but without prejudice to complainant's right, if any he has, to sue at law.

### NOTE.

MOTIVE IN INSTITUTING AN ACTION.—It is the general rule that where one has a valid cause of action against another, his motive

in instituting it is immaterial, and the fact that it is inspired by malice is no defense. *Hodge v. U. S. Steel Corp.*, 64 N. J. Eq. 111, 53 Atl. 553; *MacGinniss v. Boston & M. Consol. Copper Co.*, 29 Mont. 428, 75 Pac. 89; *Jacobson v. Van Boening*, 48 Neb. 80, 66 N. W. 993; *Macey v. Childress*, 2 Tenn. Ch. 438; *Ramsey v. Gould*, 57 Barb. 398; *Ball v. Tolman*, 119 Cal. 358, 51 Pac. 546; *McInnes v. McInnes Brick Mfg. Co.*, 38 Atl. 182 (N. J.); *Bordeaux v. Greene*, 22 Mont. 254, 56 Pac. 218; *Raughley v. Railroad Co.*, 202 Pa. 43, 51 Atl. 597; *Adams v. Union R. R. Co.*, 21 R. I. 134, 42 Atl. 515; *Phelps v. Nowlen*, 72 N. Y. 39; *Pickard v. Collins*, 23 Barb. 444; *Clinton v. Myers*, 46 N. Y. 511; *Merrill v. Dibble*, 12 Ill. App. 85; *Oglesby v. Attrill*, 105 U. S. 605; Cook, Corporations (5th ed.) § 736.

The law has nothing to do with the motive of a legal act. *Guardian Trust Co. v. White Cliffs Co.*, 109 Fed. 523; *Toler v. Railroad Co.*, 67 Fed. 168; *McMullen v. Ritchie*, 64 Fed. 253; *Lafayette Co. v. Neely*, 21 Fed. 738; *United States v. Isham*, 17 Wall. 496.