THE CENTRAL ELEVATOR COMPANY *et al.**

*v.*

THE PEOPLE *ex rel.* Moloney, Attorney General.

*Opinion filed June 18, 1898—Rehearing denied October 6, 1898.*

1. EQUITY—*when question of jurisdiction cannot be first raised on appeal.* A defendant to a bill for injunction who makes no objection to the hearing of the cause but participates therein consents to the jurisdiction, and if the subject matter is such that jurisdiction thereof may be conferred by consent, he cannot afterwards complain of the want of jurisdiction.

*The cases of *George A. Seaverns* v. *People ex rel., South Chicago Elevator Co.* v. *Same, Armour Elevator Co.* v. *Same, Charles Counselman* v. *Same, Chicago Railway Terminal Elevator Co.* v. *Same, Nebraska City Packing Co.* v. *Same, Chicago Elevator Co.* v. *Same,* and *Alexander C. Davis* v. *Same,* involving the same questions, have been considered with the above case and are disposed of by this opinion.

2. WAREHOUSES—*warehouses established by the act of 1871 are public agencies.* Warehouses established under the act of 1871 (Rev. Stat. 1874, p. 820,) are public agencies, and the proprietors thereof, as licensees, pursue a public employment, which public policy forbids shall be so conducted as to expose them to temptation of serving their personal interests at the expense of their duty to the public.

3. SAME—*public warehousemen cannot buy and store grain for themselves.* A public warehouseman has no right, under the act of 1871, to buy and store his own grain, issuing his own warehouse receipts to himself as an individual and buying and selling through his own warehouse, as such a course is inconsistent with the full and impartial performance of his duty to the public.

4. SAME—*effect of neglect of officials to prevent dealing by warehousemen.* The failure of warehouse commissioners to question the legality of private grain deals by warehousemen through their own houses is not a construction of the act of 1871 in favor of such practice.

5. SAME—*stockholder cannot use warehouse for individual business.* A stockholder in a public warehouse cannot use the property to carry on his individual business as a grain dealer.

6. INJUNCTION—*a change of defendant's relation avoids an injunction.* An injunction against one in his relation as a stockholder in a public warehouse is not binding upon him after the relation of stockholder ceases.

APPEAL from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

JOHN J. HERRICK, JACOB R. CUSTER, JAMES E. MUNROE, and JOHN P. WILSON, for appellants.

EDWARD C. AKIN, Attorney General, and HENRY S. ROBBINS, for appellee.

Mr. JUSTICE CARTWRIGHT delivered the opinion of the court:

Appellants in these nine cases were defendants in the circuit court of Cook county to informations in equity filed by the Attorney General against them as licensed proprietors of warehouses of class A in Chicago, or stockholders of corporations so licensed. The informations made the same general allegations in each case: that defendants had stored grain owned by themselves in the

particular warehouse of which they were proprietors; that not less than three-fourths of all the grain received in the public warehouses in Chicago was owned by the warehousemen; that the grades for inspection of grain were such that the grain of each grade was not of the same quality, but that separate car-loads of different quality and value were graded in the same grade; that by reason of advantages of the defendants, as owners of warehouses, in mixing and manipulating grain and rebating storage charges and otherwise, they had been enabled to drive out competition and to hold and enjoy the privilege of buying grain free from competition, and that such storing of grain was unlawful and injurious to the public. All the informations prayed for the same relief, —a perpetual injunction to restrain defendants, as warehousemen, from storing grain in their own warehouses. The answers admitted, in each case, that defendants were operating public warehouses of class A, in which grain was stored in Chicago, and that they had stored grain owned by them in their own warehouses, and claimed the right to do so. The answers also set up a general custom of thirty years' standing, under which the proprietors of public warehouses were accustomed to store their own grain and mix it with the grain of their customers, and also that the warehouse commissioners had construed the act of 1871 as permitting that custom, and that such purchases of grain and such custom had a beneficial effect upon producers, shippers of grain and dealers in grain throughout Illinois and the north-west. A great amount of evidence was taken, and a decree was entered in each case granting the relief prayed for. Where the defendant was a corporation, the stockholders were enjoined from storing their own grain in the elevators of their own corporations. These appeals were prosecuted from the decrees so entered. The cases were argued together and were all submitted upon the same briefs and arguments.

It is contended that a court of equity has no jurisdiction in a case of this character, and, especially, because by the provisions of the Warehouse act the license is made revocable for any violation of law, so that the statute affords a sufficient remedy for any illegal act by the licensee. This objection was not made by the answers, and the fact that the statute provides an efficient remedy for a violation of duty by a warehouseman and licensee cannot be raised for the first time in this court, if the case is one in which a court of equity might, under any circumstances, obtain jurisdiction. There are subjects which cannot be brought before a court of chancery, even by consent of the parties; but if a defendant makes no objection to a hearing of the cause, and participates in it, he must be regarded as consenting to the jurisdiction, and if the subject matter is such that jurisdiction can be conferred in that way he will not be heard to complain of the want of it. In such a case, if a defendant goes to a hearing without objection he cannot, in case of defeat, make the objection here. (*Stout* v. *Cook,* 41 Ill. 447; *Dodge* v. *Wright,* 48 id. 382; *Hickey* v. *Forristal,* 49 id. 255; *Magee* v. *Magee,* 51 id. 500; *Gridley* v. *Watson,* 53 id. 186; *Knox County* v. *Davis,* 63 id. 405; *Ryan* v. *Duncan,* 88 id. 144; *Richards* v. *Lake Shore and Michigan Southern Railway Co.* 124 id. 516; *Crawford* v. *Schmitz,* 139 id. 564; *Clemmer* v. *Drovers' Nat. Bank,* 157 id. 206.) Clearly, this is such a case. The relief sought by the informations, and the subject matter, are neither of them foreign to equity jurisdiction The constitution declares that warehouses such as defendants are licensed to carry on are public warehouses, and that it shall be the duty of the General Assembly to pass all necessary laws to give full effect to that article of the constitution, which shall be liberally construed to protect producers and shippers. In compliance with the requirements of the constitution the Warehouse act of 1871 was enacted, by which defendants were permitted to exercise the business of public warehouse-

men and to conduct such public warehouses. They procured their licenses, and thereby voluntarily submitted their property to the law. The right of the State to control them in that business is conceded, and the right of the State, through its Attorney General, to restrain them in the use of their public warehouses within the limitations of the law and to prevent resulting public injury is not foreign to the powers or jurisdiction of a court of equity. Defendants could not operate their warehouses and devote them to such uses without a license and the giving of a bond to faithfully comply with the law. The Attorney General alleged injury to the public from violations of the laws governing them and their warehouses, and this authorizes the court of equity to protect the public right,—at least where there is no objection that the law furnished an adequate remedy.

It is a firmly established rule that where one person occupies a relation in which he owes a duty to another he shall not place himself in any position which will expose him to the temptation of acting contrary to that duty or bring his interest in conflict with his duty. This rule applies to every person who stands in such a situation that he owes a duty to another, and courts of equity have never fettered themseves by defining particular relations to which, alone, it will be applied. They have applied it to agents, partners, guardians, executors, administrators, directors and managing officers of corporations, as well as to trustees, but have never fixed or defined its limits. The rule is founded upon the plain consideration that the one charged with duty shall act with regard to the discharge of that duty, and he will not be permitted to expose himself to temptation or be brought into a situation where his personal interests conflict with his duty. Courts of equity have never allowed a person occupying such a relation to undertake the service of two whose interests are in conflict, and then endeavor to see that he does not violate his duty, but forbid such a course of dealing ir-

respective of his good faith or bad faith. If the duty of the defendants, as public warehousemen, stands in opposition to personal interest as buyers and dealers in grain storing the same in their own warehouses, then the law interposes a preventive check against any temptation to act from personal interest by prohibiting them from occupying any such position.

The public warehouses established under the law are public agencies, and the defendants, as licensees, pursue a public employment. They are clothed with a duty toward the public. The evidence shows that defendants, as public warehousemen storing grain in their own warehouses, are enabled to, and do, overbid legitimate grain dealers by exacting from them the established rate for storage while they give up a part of the storage charges when they buy or sell for themselves. By this practice of buying and selling through their own elevators the position of equality between them and the public whom they are bound to serve is destroyed, and by the advantage of their position they are enabled to crush out, and have nearly crushed out, competition in the largest grain market of the world. The result is, that the warehousemen own three-fourths of all the grain stored in the public warehouses of Chicago, and upon some of the railroads the only buyers of grain are the warehousemen on that line. The grades established for different qualities of grain are such that the grain is not exactly of the same quality in each grade, and the difference in market price in different qualities of the same grade varies from two cents per bushel in the better grades to fifteen cents in the lower grades. The great bulk of grain is brought by rail and in car-loads and is inspected on the tracks, and the duty of the warehousemen is to mix the car-loads of grain as they come. Such indiscriminate mixing gives an average quality of grain to all holders of warehouse receipts. Where the warehouseman is a buyer the manipulation of the grain may result in personal advantage

to him.   Not only is this so, but the warehouse proprietors often overbid other dealers as much as a quarter of a cent a bushel and immediately re-sell the same to a private buyer at a quarter of a cent less than they paid, exacting storage which more than balances their loss. In this way they use their business as warehousemen to drive out competition with them as buyers.   It would be idle to expect a warehouseman to perform his duty to the public as an impartial holder of the grain of the different proprietors if he is permitted to occupy a position where his self-interest is at variance with his duty. In exercising the public employment for which he is licensed he cannot be permitted to use the advantage of his position to crush out competition and to combine in establishing a monopoly by which a great accumulation of grain is in the hands of the warehousemen, liable to be suddenly thrown upon the market whenever they, as speculators, see profit in such course.   The defendants are large dealers in futures on the Chicago Board of Trade, and together hold an enormous supply of grain ready to aid their opportunities as speculators.   The warehouseman issues his own warehouse receipt to himself.   As public warehouseman he gives a receipt to himself as individual, and is enabled to use his own receipts for the purpose of trade and to build up a monopoly and destroy competition.   That this course of dealing is inconsistent with the full and impartial performance of his duty to the public seems clear.   The defendants answered that the practice had a beneficial effect upon producers and shippers, and naturally were able to prove that when, by reason of their advantages, they were overbidding other dealers there was a benefit to sellers, but there was an entire failure to show that in the general average there was any public good to producers or shippers.

The answers also set up, and it is claimed here, that there was, at the time of the passage of the Warehouse act, a general custom of warehousemen to deal in grain

174—14

and to store it in their warehouses, and that the law was passed with reference to that existing custom. The evidence fails to establish any such custom. The amount so bought and stored or dealt in up to the year 1885 was trifling, and the first time when there was any material increase was in 1890. Many witnesses who would have known if such a practice or usage existed united in denying all knowledge of it, and many of them testified that they never knew or heard of any elevator owner buying or selling grain prior to 1885. There was no such custom.

Finally, it is claimed that there has been a practical construction of the law by the warehouse commissioners permitting the practice complained of. There was a little buying and storing of grain by warehousemen from time to time, but it was so insignificant as to call no attention to it until in recent years. It is said, however, that since the practice became common the warehouse commissioners, charged with the administration and enforcement of the law, did not question the legality of the practice. There was nothing in the nature of affirmative construction, and the most that can be said is, that the warehouse commissioners failed to appeal to the Attorney General to institute a suit and failed to prosecute the offenders. That fact does not amount to practical construction. If the commissioners were derelict it would not bind the public, and indifference on their part could not have that effect.

Neither are the public barred by *laches.* The stockholders who were made defendants occupy such a relation to their corporations that they cannot be permitted to use the property which they have devoted to public use to carry on their individual business with substantially the same effect and the same deleterious result to the public interest as if done by the corporation. These persons were made defendants as stockholders, and the only relief sought against them was in that relation. The charges and findings against them were on account of

the existence of that relation, and, as we interpret the decrees, the permanent injunctions are against them as stockholders. They are permanent only so long as the relation and interest on which they are based shall exist.

The decree of the circuit court is affirmed.

*Decree affirmed.*