THE PEOPLE *ex rel.* John J. Healy, State's Attorney, Appellant, *vs.* THE ILLINOIS CENTRAL RAILROAD COMPANY *et al.* Appellees.*

*Opinion filed February 20, 1908—Rehearing denied April 10, 1908.*

1. CORPORATIONS—*implied powers cannot enlarge the express powers.* A corporation may exercise only those powers expressly granted to it and such implied powers as are necessary to carry the express ones into effect; but the implied powers cannot enlarge the express ones so as to authorize the corporation to engage in enterprises but remotely connected with its specific corporate purposes.

2. WAREHOUSES—*a public warehouse must serve the public indiscriminately.* A public warehouse, under the statute, is a place where grain or other property offered for storage by all persons, indiscriminately, must be accepted and stored.

*With this case are decided the following consolidated cases: No. 5596, *People* v. *Chicago, Burlington and Quincy Railroad Co. et al.* and 5598, *People* v. *Chicago, Rock Island and Pacific Railway Co. et al.*

3. RAILROADS—*railroad has no implied power to maintain public warehouse.* The duties of a railroad company as a common carrier to transport grain, furnish temporary storage at transfer points preliminary to delivery or re-shipment and to maintain rail connections with public warehouses where grain is stored do not authorize the company to engage in the business of conducting a public warehouse for grain.

4. SAME—*duty of railroad company forbids monopolization of its warehouses.* The duty of a railroad company to transport all grain that is offered for shipment forbids that it shall so conduct its business that third persons over whom it has no control can use its warehouses indefinitely for the storage of grain to the exclusion of other patrons of the road and the embarrassment of the company in performing its duty as a common carrier.

5. SAME—*railroad company cannot do indirectly what it has no power to do directly.* A railroad company having no power to conduct a public warehouse cannot be compelled by a decree in chancery to contract with a third person to carry on the business.

6. SAME—*when a railroad is not required to continue to maintain a public warehouse.* The fact that a railroad company has for many years leased its warehouses to parties who have maintained them as class "A" warehouses to the advantage and convenience of a board of trade, does not impress the property with such a public use as prevents the company from discontinuing such warehouses.

CARTER, J., specially concurring.

APPEAL from the Circuit Court of Cook county; the Hon. LOCKWOOD HONORE, Judge, presiding.

This is an information in the nature of a bill in equity filed by the People of the State of Illinois, by the State's attorney of Cook county, on the relation of the Chicago Board of Trade, to enjoin the Illinois Central Railroad Company, the Central Elevator Company, and certain individuals who have the control and management of certain public grain elevators, from discontinuing the operation of such grain elevators as public warehouses of class "A." Upon the execution of a bond in the sum of $20,000 by the Chicago Board of Trade a temporary injunction was awarded in accordance with the prayer of the information. Subsequently, by amendment, the Chicago Board of Trade, as relator, was stricken from the information, and the cause

thereafter proceeded in the name of the People, by John J. Healy, State's attorney of Cook county. The defendants filed a motion to dissolve the injunction, which, upon a hearing before Judge Honore, of the circuit court of Cook county, was sustained and the information dismissed for want of equity. From this decree the People of the State of Illinois have prosecuted an appeal to this court.

By an order entered in vacation by Mr. Justice Carter, of this court, the temporary injunction was continued in force until the final hearing of this appeal. Similar informations were filed against the Chicago, Burlington and Quincy Railroad Company *et al.* and the Chicago, Rock Island and Pacific Railway Company *et al.* These cases have been consolidated in this court and will be disposed of as one case.

The material averments of the information are, that the Illinois Central Railroad Company is a common carrier, created by special statute of this State, with power to locate, construct, maintain and operate a railroad between different terminals in this State, and with power to acquire, by purchase or condemnation, and to hold, such real and personal estate as may be needful to carry into effect the purposes and objects of said special statute; that among other lands acquired by said company for railroad purposes were two parcels of land in Chicago contiguous to the Chicago river and Lake Michigan, upon which private parties erected two grain warehouses of a joint capacity of two and one-half million bushels, equipped with different compartments, elevating machinery and apparatus, in which warehouses grain of the same grade might be mixed and stored in bulk; that these warehouses were acquired by said railroad company and leased to private corporations, who have operated one or both as public warehouses of class "A;" that switch tracks were constructed by said company from its main lines to said warehouses, so that cars loaded with grain coming into Chicago over its lines could be run directly to said

warehouses, and by means of said appliances such grain could be promptly and mechanically unloaded from cars to said elevators or warehouses and from said elevators or warehouses unloaded into vessels and other cars; that with the exception of a short period when said elevators were destroyed by the fire of 1871, at least one of said warehouses has been since 1856 continuously conducted and maintained, with the sanction of said railroad company, as a public warehouse of class "A," and said railroad company has invited shippers of grain over its line to have grain shipped by them over said lines and unloaded into the said warehouses and has held out such elevators or warehouses to the public as public warehouses, so that at all times since 1856, except during the interval of the rebuilding of the warehouses caused by the fire, every shipper of grain over said railroad has at all times been able to have his grain unloaded into a public warehouse in Chicago and to have issued to him a warehouse receipt representing said grain, and to have said grain there remain until the shipper could advantageously sell or re-ship the same, and in case of re-shipment to other points, to expeditiously and economically and mechanically unload such grain upon cars or boats for re-shipment, and no shipper of grain over said lines has since said year been obliged to unload said grain from cars, or been deprived of having his grain unloaded into a public grain elevator or warehouse, or been deprived of the facilities for economically and mechanically and expeditiously transferring said grain to other cars or boats, to be shipped to points beyond Chicago, which said warehouses afford; that grain shippers have become accustomed to rely upon and have adjusted their business methods to this manner of handling grain in Chicago, and that if said warehouses were now to cease to be conducted as public warehouses of class "A" irreparable injury would result to them.

The information, proceeding, stated the amount of grain shipped and stored for a period of thirty-two years, and

that it would be impossible to properly handle or re-ship all grain coming into Chicago over the lines of said railroad without the use, as public warehouses, of one or both of said elevators, or others of like construction, situation and capacity, and the issuance of warehouse receipts; that during all this time elevators have been operated by private parties, and that since 1886 said elevators have been leased to appellee the Central Elevator Company; that the appellees the members of the firm of Bartlett, Frazier & Carrington, who were the stockholders of the appellee the Central Elevator Company, have announced that after July 1, 1907, "they would not comply with the rules of said board and make their receipts regular for delivery upon contracts upon said board of trade," and that neither of the said warehouses will remain or be conducted as a public warehouse. The information further says that there are now no other public grain warehouses, except one of the said elevators or warehouses operated by appellee the Central Elevator Company, in the city of Chicago upon the lines of said Illinois Central Railroad Company; that if shippers of grain to Chicago over the lines of said railroad company were now to be deprived of having their grain unloaded into public warehouses and having it remain there until re-sold or re-shipped, and having issued to them, while said grain is in store, warehouse receipts of the character to be current in Chicago, their right to market and sell their grain in Chicago will be much impaired; that the people, and especially those engaged in raising, shipping, handling or selling of grain in this State, will be unduly prejudiced if a temporary injunction should not issue against appellees, immediately and without notice.

The information further charges "that the Chicago Board of Trade has had for many years, and now has, a rule prescribing that to make elevator receipts issued by any public grain elevator in Chicago deliverable upon contracts made upon said board of trade, the manager of such warehouse

shall conduct such warehouse in accordance with the laws
of the State of Illinois, and shall give a bond to the board
of trade to protect .its members against any failure of said
warehouseman to properly conduct said warehouse; that
for many years, and during all the time such rule has been
in force, every public grain warehouse of class "A" in Chi-
cago has complied with this requirement and thereby made
its receipts regular for delivery on the said board of trade,
where most of the business of buying and selling grain for
present and future delivery in the city of Chicago is trans-
acted, * * * and that much of said grain since the year
1856 has been, and now is, sold upon such exchange for
future delivery and before its arrival in Chicago, and that
by the usages of trade and the rules of such exchange which
have prevailed during all of said time, such future contracts
can only be performed by the delivery of warehouse receipts
issued by public warehouses located in Chicago."

W. H. STEAD, Attorney General, JOHN J. HEALY,
State's Attorney, and HENRY S. ROBBINS, for appellants.

JOHN G. DRENNAN, (W. S. KENYON, and J. M. DICK-
INSON, of counsel,) for appellee the Illinois Central Railroad
Co.; W. S. OPPENHEIM, for the South Chicago Elevator
Co.; MORAN, MAYER & MEYER, for Joseph Rosenbaum and
J. Rosenbaum Grain Co.; BENJAMIN S. CABLE, for the
Chicago, Rock Island and Pacific Railway Co.; CHESTER
M. DAWES, and HERBERT HAASE, for the Chicago, Burling-
ton and Quincy Railway Co.; JAMES E. MUNROE, for the
Armour Elevator Co. and the Armour Grain Co.

GEORGE P. MERRICK, for other appellees.

Mr. JUSTICE VICKERS delivered the opinion of the court:

The question over which the most serious contention ex-
ists in this case is whether the railroad company has the
power, under its charter, to maintain and operate, or cause

to be operated, the elevators in question as public ware-houses of class "A." If the prayer for a perpetual injunc-tion is granted, the duty of the railroad company to main-tain these elevators as public warehouses would thereby be legally established. There are only two methods by which the railroad company could comply with the decree if the injunction were granted. The railroad company must either operate the elevators itself, or lease them to other persons and require the lessees to comply with the decree. If the latter course be pursued, the primary responsibility would rest on the railroad company. It could not excuse itself for a failure to obey the decree by showing that it had contracted with another to perform the duty required of it.

Appellants suggest that the power of the railroad com-pany to operate the elevators in question directly, as public warehouses, does not arise as a practical question, since by making the rentals reasonable the company would always be able to find some one who would be willing to lease the elevators and agree to operate them in the required manner. We fail to see the force of this contention. If the railroad company does not possess the power to directly engage in the warehouse business, it would seem to be paradoxical to compel it to contract with another to carry on such business and hold it responsible for the faithful observance of the decree by such third party. In *First M. E. Church of Chi-cago* v. *Dixon,* 178 Ill. 260, this court held that the church, having no power to devote its real estate to secular pur-poses for gain, could not, by executing a lease, authorize its lessee to erect a building to be used as an office building, even though a part of such building was reserved for the use of the congregation as a place for religious worship. See, also, *Thomas* v. *Railroad Co.* 101 U. S. 71.

Appellants do not, however, seem to rest much confidence in the suggestion above referred to. Recognizing the real question to be the existence or non-existence of the power in the railroad company to own and operate these ware-

houses, they unreservedly assert that the company has power
to both own and operate the warehouses in connection with
and as a part of its railroad.   The general rule in regard to
the powers of corporations, established by many decisions
of this court, is, that they may exercise those powers ex-
pressly given and such others as are necessary to carry the
express powers into effect.   (*Rockhold* v. *Canton Masonic
Benevolent Society,* 129 Ill. 440; *People* v. *Pullman's Pal-
ace Car Co.* 175 id. 125.)   It is not contended that the
power to own and operate public warehouses, as a business,
is expressly conferred by the special charter of the Illinois
Central Railroad Company or by any general law relating
to railroads in this State.   Appellants' contention is that the
power contended for is implied, because its exercise is nec-
essary in order to enable the railroad company to accomplish
its duties as a common carrier of grain.   A power which
the law will regard as existing by implication must be one
in a sense necessary,—that is, needful, suitable and proper
to accomplish the object of the grant; one that is directly
and immediately appropriate to the execution of the specific
powers, and not one that has but a slight, indirect or remote
relation to the specific purposes of the corporation.   *Chicago
Gas Light Co.* v. *People's Gas Light Co.* 121 Ill. 530; *Peo-
ple* v. *Pullman's Palace Car Co. supra.*

A public warehouse is defined by the constitution of this
State as follows:  "All elevators or storehouses where grain
or other property is stored for a compensation, whether
the property stored be kept separate or not, are declared to
be public warehouses."   By the statutes of the State pub-
lic warehouses are divided into three classes, designated as
classes "A," "B". and "C."   Public warehouses of class "A"
include all warehouses, elevators and granaries in which
grain is stored in bulk and in which the grain of different
owners is mixed together so that the identity of different
lots cannot be accurately preserved.   Warehouses, elevators
or granaries of class "A" are only located in cities having

not less than 100,000 inhabitants. The statute in relation
to warehouses of this class provides that before the ware-
houseman shall enter upon his business he shall give a bond
and take out a license to act as such public warehouseman.
When he has obtained his license he is thereupon required
to store grain tendered to him by the public; to care for
the grain; to issue warehouse receipts therefor and cancel
the same upon delivery; make regular reports of the con-
dition of the grain, amount stored, and all other matters
connected with his business as a public warehouseman of
class "A." Among the duties required of public warehouse-
men by the statute is, that the warehouse shall be, in fact,
what its name implies,—a public warehouse,—in the sense
that it must serve the public by accepting and storing grain
tendered for storage by all persons indiscriminately.

It will be observed that the information does not seek
to compel the railroad company to provide warehouse facil-
ities for such grain as it transports to Chicago as a common
carrier, but the prayer is, in effect, that the company shall
continue to operate, or cause to be operated, the two ele-
vators in question as public warehouses of class "A." Nor
is there any averment in the information that any shipper
of grain over the railroad has been denied ample storage
facilities or that there is any threat to so deny them. But
it is insisted by appellants that the maintenance of such
warehouses is incidental to and necessary in connection
with the railroad's duty to the public as a common carrier
of grain.

The primary purpose of a commercial railroad is to
carry freight and passengers for hire from one point to an-
other on its line. Such corporations obtain valuable fran-
chises from the State, and in return they engage to carry,
without discrimination, for all persons who see proper to
employ them. To enable such corporations to discharge their
functions they must, of necessity, exercise various powers
not expressly granted by their charters. Powers are given,

by implication, to discharge all duties which such corporations owe to the public. Wherever the law exacts a duty of a corporation to the public, the existence of the duty implies the power to perform it. It would be idle for the State to impose a duty on such companies and at the same time withhold from them the power to perform it. Implied powers are never allowed to enlarge express powers, so as to warrant the corporation in devoting its capital to purposes not expressly authorized, or to engage in enterprises not directly, but only remotely, connected with its specific corporate purposes. (*First M. E. Church of Chicago* v. *Dixon, supra.*) It is the duty of every railroad corporation which shall receive any grain in bulk for transportation to any place within this State, to transport the same and deliver it to the consignee, provided such delivery can be made over any lines of road which the carrier is permitted to use, and all railroads are required to permit connections to be made and maintained with their tracks to and from any and all public warehouses where grain is or may be stored. (Hurd's Stat. 1905, chap. 114, sec. 3.)

It will thus be seen that there is nothing in the statute imposing the duty on a railroad company to furnish public warehouse facilities or to engage in the business of public warehousing and issue receipts to meet the wants or convenience of members of a trading exchange. It may be conceded that, as incidental to their duty to transport grain in bulk, railroad companies may, under some circumstances, have the power to furnish storage room for grain at important transfer points temporarily, to enable the owner to collect enough for a cargo where the grain is to be reshipped by water, and it is well known that many railroads maintain grain elevators for such purposes; but such storage contemplates a rotation, so that no one shipper or consignee can monopolize all the storage room and hold the same indefinitely or until the market seems to justify him in selling his grain. The duty of the railroad company to

the public to transport all the grain that is offered for transportation forbids the company from adopting a method of business which would permit third parties, over whom the company has no control, to use its storerooms and warehouses indefinitely, to the exclusion of other patrons and the embarrassment of the company in the performance of its duty as a carrier. The combined capacity of the two elevators in question is 2,500,000 bushels, which is less than ten per cent of the grain annually transported to Chicago by the Illinois Central Railroad Company. If appellants' contention is sustained, it would be possible for one buyer of grain to monopolize all the bins in these two elevators. One person might thus become the owner of all the grain in the elevators. Appellants would compel the railroad company, or its lessees in charge of the elevators, to issue such owner warehouse receipts for the grain stored. As long as the owner is willing to pay storage charges to a public warehouse we know of no law limiting the time of storage. Under the possible condition suggested, the ability of the railroad company to serve the public would be dependent upon the will and pleasure of the owner of the grain in the elevators. While this might be a great convenience to persons engaged in trading on the board of trade, we are unable to see how the public generally will be benefited or the railroad company will thereby be the better able to discharge its duties as a carrier. The producer and consumer of grain alike require the services of railroad companies to transport grain from the former to the latter, but neither will be benefited by having the grain lodged in a public warehouse at some intermediate point for an indefinite time, in order to allow speculators to use the receipts representing such grain as a trading commodity. That a railroad company has no power, either express or implied, to own and operate a public warehouse as an incident to public purposes as a public carrier, is in our opinion supported by sound reason and authority.

In *Franklin Nat. Bank* v. *Whitehead,* 149 Ind. 560, (39 L. R. A. 725,) it was held that only corporations organized for the purpose of carrying on the business of warehousemen were authorized to take out a license to conduct a general warehouse business, notwithstanding the statute of that State provided that "any person or incorporated company" might obtain a permit to keep a public warehouse. In that case a corporation for manufacturing purposes applied for and obtained a license to keep a public warehouse. It issued warehouse receipts upon its own products on hand and pledged such receipts as security to the bank. It was held that the warehouse receipt was void and conferred no rights upon the bank, for the reason that the corporation issuing such receipt was not incorporated for the purpose of conducting a warehouse business.

*Louisiana* v. *Southern Pacific Ry. Co.* 52 La. Ann. 1822, is a case very much like the one at bar. In disposing of the case then before the court the Supreme Court of Louisiana said: "We are of the opinion that the defendant company is not authorized to receive for storage, for hire, in warehouses, goods or produce which have not been received by it under and from shipments by its road or for shipments upon its road. We think it authorized to receive them for storage in warehouses under and from shipments upon its road and for shipments by its road, to the extent that such storage is in fulfillment of its obligations as a common carrier, and not otherwise and no longer. We do not consider that storage of such goods and merchandise by defendant in warehouses, for hire, is incidental to its business as a railroad corporation and common carrier when the storage is made under either an express or implied, special or general, agreement with shippers or consignees, either before or at the time of shipment or on receipt of goods, that they should be received and held for storage, for hire, either for a fixed time or at the will of the shippers or consignees. We have already stated that permanence in the storage is,

in our opinion, inconsistent with the idea of its being incidental to the operation of a railroad corporation or necessary for its business as a common carrier. The fact that by availing itself of its control of switches, tracks and superior terminal facilities defendant may offer special advantages and accommodations to shippers in storing their goods, and thereby obtain increased revenues as a corporation, is not at all determinative of the question whether the storage is incidental to its business as a railroad corporation or the revenues received therefrom accrue to it as a common carrier. We think that the storage of goods by a railroad in its warehouses, as a matter incidental to its business as such, contemplates and looks to a rotation of storage as immediate and prompt as the railroad corporation can make it. If storage for hire be made by the railroad corporation, it should only be under an enforced storage resulting from the fact that shippers have failed to receive promptly, as they should do, the shipments carried over the road, and from this enforced storage the corporation itself should rid itself as quickly as possible. Inasmuch as the continuity of the relations between the parties have, by novation, been broken, and changed from those of shipper or consignee and common carrier to those of bailors and bailees, and the railroad company receives for the storage a consideration other than the regular freight rate, the storage takes on a different form and character from that which it would otherwise have, and becomes a substantive, independent and not an incidental business. To be incidental business the storage must be preliminary, either to immediate transportation or immediate removal."

In the case of *State of Maryland* v. *Baltimore and Ohio Railroad Co.* 48 Md. 49, the court, in discussing a similar question to the one now under consideration, used the following language: "And this brings us to the question, what are the buildings and works necessary and expedient to the operation of the road, within the meaning of the ap-

pellee's charter?  And here we are met with the argument
that 'necessary' means buildings and works indispensable to
the road.  This, however, is not a mere dictionary question,
but one involving the construction of a power granted to a
railroad company to enable it to accomplish the objects for
which it was chartered; and as used in this connection it
is clear the legislature meant such buildings and works as
were reasonably convenient and appropriate to the main-
tenance and operation of the road.  Construed in this sense,
the question is whether 'necessary' buildings embraces the
elevators, wharves, piers and docks owned by the appellee.
Now, one of the main objects in chartering this company
was to bring the western trade to the port of Baltimore,—
not merely to supply a local demand, but for the purposes
of transhipment as ocean commerce.  These buildings and
structures are therefore necessary for the business of the
appellee as a common carrier, for the purposes of receiving
and storing grain and freight shipped over its road after the
same have reached the place of destination and previous to
delivery to the consignee or owner.  But the rights of the
appellee in this respect are such as pertain to its functions
as a common carrier, and as such it has no right to own
and use the structures for the storage of grain and freight
after the owner or consignee has had a reasonable time to
remove the same.  The act of 1826 does not certainly au-
thorize the appellee to carry on the general and ordinary
business of a warehouseman, and, however closely such
business may be connected with that of a carrier, it is in no
sense necessary to the exercise of the rights and privileges
granted to the appellee as a railroad company."

In *Attorney General* v. *Great Northern Railway Co.* 29
L. J. Ch. (N. S.) 794, vice-chancellor Kindersley was called
upon to determine whether dealing in coal by the railway
company was illegal, because incompatible with its duties as
a public carrier and calculated to inflict an injury upon the
public.  It was there determined that the act of parliament

granting the charter to operate the railway implied a prohibition against the company's engaging in any other business, and the reason for the rule there laid down was thus expressed (p. 798) : "These large companies, joint stock companies generally, for whatever purpose established, and more particularly railway companies, are armed with powers of raising and possessing large sums of money,—large amounts of property,—and if they were to apply that money or that property to purposes other than those for which they were constituted, they might very much injure the interests of the public in various ways." The vice-chancellor further said, on page 799: "If they can do that with regard to coal, what is to prevent their doing it with every species of agricultural produce all along the line? Why should they not become purchasers of corn, of all kinds of beasts, and of sheep, and every species of agricultural produce, and become great dealers in the supply of edibles to the markets of London? And why not every other species of commodity that is produced in every part of the country from which or to which their railway runs? I do not know where it is to stop if the argument on the part of the company is to prevail. There is, therefore, great detriment to the interests of the public for this reason, taking merely the article of coal." The doctrine of this English case is quoted with approval in *New York, New Haven and Hartford Railroad Co.* v. *Inter-State Commerce Commission,* 200 U. S. 361.

*In the matter of Swigert,* 119 Ill. 83, this court had occasion to determine whether a grain elevator belonging to the Illinois Central Railroad Company, located on a lot of ground belonging to the company on the Ohio river and within the limits of the city of Cairo, was exempt from taxation for other than State purposes. The elevator was within fifty feet of the main track of the company's road leading into the city and was connected therewith by side-tracks. It was so constructed as to receive and discharge grain both by rail and river. The elevator in question was

leased by the company to Halliday Bros., who had the exclusive control of it.  In holding that the elevator could not be exempt from taxation under the general power of the company to purchase, hold and use all such real estate and other property as may be necessary for the construction of its railway and stations and other accommodations, which property, under the charter, was exempt from local taxation, this court, speaking by Mr. Justice Mulkey, on page 90, said: "It [the warehouse or elevator in question] has no direct connection with the road or its operation, yet when shipments of grain are made, either to or from it, over the company's road, it is very clear the company can handle the grain thus shipped with more ease and greater facility, and hence can, by means of it, do a greater amount of business. But this is purely incidental, and falls far short of establishing the proposition that a vast elevator like this, costing $200,000 or $300,000, is a necessary appendage of a railroad, or that the legislature, in granting the company's charter, intended to exempt such a structure from taxation. * * * As a mere carrier the company has no right to put a bushel of grain in it, except when directed to do so by the shipper or consignee. This necessarily results from the fact that all grain, as is shown by the testimony, is stored in it according to grade, and not according to ownership. * * * On the arrival of a consignment of goods the company has the right to at once store them in its own warehouse. The company is bound to carry grain in bulk and deliver the same from cars or other convenient place of storage, without extra charge, now, just the same as it was before the elevator was built, if so required; and the company has no right to mix one man's grain with others unless permitted to do so by the owners. It is clear, therefore, outside of the incidental benefits resulting to the company from a law of business, rather than from any municipal regulation, the elevator has no necessary connection with the construction, maintaining or operation of the company's

road, and such being the case, it clearly does not come within the exemption. If the elevator was used exclusively by the company in receiving grain for shipment, or for storing it after shipment, without any additional charge therefor, except where the owner neglected to take it away within a reasonable time after its arrival, the property would then be clearly exempt from taxation. But such is not the case. Buildings used for the storage of grain for compensation are indifferently called warehouses, granaries and elevators. Vast amounts of capital are invested in them, and, like railroads and other *quasi* public property, are under legislative control. Their construction and operation constitute a distinct business in the State, of vast magnitude. They are a great convenience to the community in which they are situated, and particularly to the owners of the railways with which they are almost universally connected."

A similar question to the one decided in the foregoing case was decided in *Illinois Central Railroad Co.* v. *People,* 119 Ill. 137. In disposing of the question of exemption in the last case above cited, this court, speaking by Mr. Justice Scholfield, on page 140, said: "That freight houses, elevators, etc., constructed and used solely for the purpose of enabling the company to perform its duty as a common carrier, are exempt from taxation we think is beyond question; but the company has no more authority, under its charter, to enter upon the business of warehousing, generally, than it has to enter upon that of merchandising, and property, therefore, devoted to such a use, not being within the contemplation of its charter, cannot be within the exemption."

While these two cases deal with the question of exemption from local taxation, the holding that the elevator was liable to taxation is based on the ground that the power to operate the elevator could not be sustained as implied or incidental to the power to own and operate a commercial

railroad.   We regard these cases as authorities against ap-
pellants' contention in the case at bar.

Appellants contend that the railroad company having de-
voted these elevators for a long term of years to use as pub-
lic warehouses, they have thereby become impressed with a
public use,—that is, with the right of the public to have
that use continued.   If this argument were limited to the
duty of the railroad company to maintain these elevators-
for the use of shippers and buyers of grain who had for a
long term of years enjoyed the right of temporary storage
therein, and it were shown that such storage was in further-
ance of the usual and ordinary business of transportation
of grain, there would be more force in it.   But the argu-
ment is not so limited.   It goes to the full length of the
right claimed by the prayer of the information.   The fal-
lacy in this contention consists in a failure to distinguish
between the rights of the public and the rights of certain
members of the Chicago Board of Trade.   We have already
pointed out that the public interest did not seem to demand
the permanent storage of grain in regular public ware-
houses, and the issue of warehouse receipts in the manner
and for the purposes provided by the rules of the board of
trade.   If all the public warehouses in Chicago of class "A"
should cease to be regular,—that is, cease to comply with
the rules of the board of trade, by force of which their re-
ceipts would not be receivable on contracts for grain sold
for future delivery,—we are not prepared to say that any
public injury would result.   True, it would no doubt affect
the business of persons engaged in dealing in grain for fu-
ture delivery.   In no event can it be admitted that the rail-
road companies of the State owe any duty to the Chicago
Board of Trade on the theory that the members of that
corporation are the public, in the sense that property once
devoted to a use which serves the purposes and convenience
of the members of that exchange is thereby impressed with

a public use and cannot for that reason be withdrawn from such use.

It seems to us that the interest of the public is not so great in the outcome of this litigation as appellants' counsel seek to make it appear. From the year 1900 to 1906, both inclusive, the Illinois Central Railroad Company transported to Chicago 237,786,139 bushels of grain. During the same time the two elevators in question handled 13,280,000 bushels of grain, or about five per cent of the total quantity transported by this railroad. If the elevators in question handled only five per cent of the grain, the other ninety-five per cent must have passed through this market without the use of these elevators. If the interest of the public requires that this railroad company shall maintain these two elevators, and if it is the duty of the railroad company, as an incident to the transportation of grain, to maintain these warehouses, then it logically follows that appellants should insist on the carrier building and maintaining an additional number of elevators sufficient, in capacity, to take care of the other ninety-five per cent of the grain hauled. It is not even certain that all or any part of the five per cent of the grain which actually passed through these elevators was hauled to market by the Illinois Central Railroad Company. While it is charged that these elevators are on the line of the Illinois Central railroad, still it does not follow, and is not so charged in the information, that the grain was delivered to the elevators over this particular road. It is a fact so well known that we think it may be judicially noticed, that in the regular course of business grain going to Chicago over any line of road may be readily switched, by means of the outer and inner belt lines, to any warehouse in any part of the city. It is therefore not impossible that a large part of the five per cent of grain handled by these elevators may have come to the city over any one of the many lines of railroad centering there. However this may be, it is certain, under the facts averred, that ninety-five per

cent of the grain hauled to Chicago by the Illinois Central railroad in the last seven years has not gone into either of the elevators in question. A similar condition exists in respect to the elevators on the other railroads against which informations are pending.

After giving the questions involved in this litigation that careful consideration which their importance seems to demand, our conclusion is that the information is entirely barren of facts upon which a decree granting the relief sought, or any other relief, could be predicated.

The decree dissolving the injunction and dismissing the information for want of equity will be affirmed.

*Decree affirmed.*

Mr. JUSTICE CARTER, specially concurring:

I agree with the legal conclusions reached but not with all that is said in the foregoing opinion. Some parts of the opinion, in effect, state that the storing of grain in public warehouses of class "A" in the city of Chicago and the issuing of warehouse receipts therefor, as provided under State law, are of advantage only to speculators and members of the board of trade, and not to producers or consumers of grain. Public warehouses of class "A" are the only elevators in this State, in cities having not less than 100,000 inhabitants, for whose supervision the Warehouse act of April 25, 1871, provides. (Hurd's Stat. 1905, p. 1591.) If in such cities there were no such public warehouses, then persons who desired to store grain in Chicago would be deprived of many of the safeguards which the law throws about the storage and inspection of grain. Said Warehouse act regulating warehouses and the warehousing and inspection of grain, in accordance with article 13 of the constitution of the State, provides for the licensing of proprietors of warehouses of class "A" and their giving bond for the faithful performance of their duties; prescribes the manner of issuing warehouse receipts; provides in detail for the inspection and grading

of grain and fixes the maximum storage charges in such warehouses. In a word, it is an attempt, based on experience, to provide the best method of regulating and controlling the shipping and handling of grain in the interest of both producer and consumer, and therefore necessarily in the interest of the public. The central idea of the Warehouse act is the storing of grain in public warehouses. If there were no public warehouses then the act would have very little force and effect. The warehouse receipts issued by public warehouses of class "A" must, under the law, represent actual grain stored in those warehouses, and while, undoubtedly, there may be speculation in warehouse receipts, as intimated in the foregoing opinion, it might well be argued that the evils of grain speculation do not arise from transactions which have to do with grain in actual existence, as represented by warehouse receipts, but grow out of speculative operations as to grain which the seller does not own and of which the purchaser does not expect the delivery, similar to trades made in the so-called "bucket shops," amounting practically to a wager as to the price of grain at some future date. The chief practical difference between such trades in the bucket shops and on the board of trade is, that in the latter place, under the rules of the board, the seller can be compelled to deliver the actual grain if the purchaser demands it.

The inference might also be drawn from the opinion that because the records in this proceeding show that the amount of grain stored in public warehouses has in recent years greatly decreased, therefore the advantages to the public from public warehouses of class "A" in large cities have practically disappeared. The history of the contention involved in these proceedings is quite fully set forth in the information herein and the opinions of this court in *Central Elevator Co.* v. *People,* 174 Ill. 203, and *Hannah* v. *People,* 198 id. 77. The number of bushels of grain shipped into Chicago is shown to have steadily increased during

the last few years, while the amount stored in public warehouses of class "A," and for which warehouse receipts have been issued, has steadily decreased, but it does not follow that the continuance of class "A" warehouses in Chicago is any the less a public need. The conclusion is almost inevitable from the facts shown on this record, considered with the previous litigation on this subject, that this decrease in grain represented by warehouse receipts is due to the fact that the owners or lessees of these public warehouses are still availing themselves of the undue advantage in competition which it was the purpose of our former decisions to destroy. Neither does it follow, from this decrease in the amount of grain for which warehouse receipts have been issued, that therefore there is no benefit to the general public in having public warehouses in which grain can be stored under the regulations of the Warehouse act. The opportunity for storing such grain, even though the amount actually stored is comparatively small, tends to increase the price for which grain can be sold. If Illinois were without a Warehouse act regulating public warehouses, and a country dealer or producer shipped into Chicago a number of cars of grain, and found, when they reached Chicago, that the price of grain had materially decreased in the meantime, he would be compelled to sell his grain at the then prevailing price, as there would be no practical way of storing it to wait for a future advance. While the grain can be kept for a certain length of time in cars on the tracks, yet the demurrage charges and the lack of opportunity to insure would cause too much expense and risk to allow that plan to be generally followed. Under our present public warehouse system, if the shipper should find, after his grain had reached Chicago, that the price had suddenly fallen, he could store it in the public warehouses, take warehouse receipts therefor and sell at such later date as he desired, in the meantime feeling certain that the grain as represented by these receipts would

be kept at a reasonable rate of storage and insurance and subject to sale at any time. Without these public warehouses, regulated as they are, all large shipments of grain out of Chicago would necessarily be under the control of the people who own elevators. This would lessen the number of buyers, and thereby, unless regulated in a different way than now provided by law, would certainly lessen the price of grain paid the producer and increase the profits of the few corporations or individuals owning and managing grain elevators. Then these elevator owners by the advantage of their position might be enabled to crush out, as they have heretofore "nearly crushed out, competition in the largest grain market in the world." *Central Elevator Co.* v. *People, supra,* on page 208.

The fact that anyone shipping grain to Chicago can store it in a public warehouse prevents private elevators having a monopoly in the purchase of grain, and thus has a very strong tendency to increase the selling price of grain. It is a well known fact that if one railroad reduces freight rates all other competing roads must meet such reduction. The great argument in favor of public canals and waterways generally, is the effect they have upon shipping and freight rates. Applying this same line of reasoning to public warehouses in a great grain center, as to the storing and grading of grain, it is self-evident that the existence of such warehouses, regulated by our present Warehouse act, must necessarily have a salutary effect upon the price of grain and the conduct of the grain trade, with a resultant benefit to the public at large.

Notwithstanding my belief that public warehouses of class "A" are beneficial both to the producer and consumer, and therefore on the ground of public policy some method should be devised to keep them in operation, I am convinced that as the law now stands in this State the courts cannot compel the defendants to conduct these warehouses as public elevators of class "A."